## Case No. 229.
### ALLEN v. McKEAN.
### [1 Sumn. 276.][1]

Circuit Court, D. Maine. May Term, 1833.

CONSTITUTIONAL LAW—OBLIGATION OF CONTRACTS — CORPORATE FRANCHISES — COLLEGE CHARTER —ASSUMPSIT.

1. A college, merely because it receives a charter from the government, though founded by private benefactors, is not thereby constituted a public corporation controllable by the government; nor does it make any difference, that the funds have been generally derived from the bounty of the government itself.
[Cited in Pennsylvania College Cases, 13 Wall. (80 U. S.) 220.]

2. The visitatorial power is a mere power to control and arrest abuses, and to enforce a due observance of the statutes of a charity; it is not a power to revoke the gift, to change its uses, or to divest the rights of the parties entitled to the bounty.

3. The visitatorial power is an hereditament founded in property, and valuable in the intendment of law; and where it is vested in trustees, there can be no amotion of them from their corporate capacity, and no interference with the just exercise of their authority, unless it is reserved by the statutes of the foundation or charter. The trustees are, however, subject to the general superintendence of a court of chancery for any abuse of their trust.

4. Bowdoin College is a private, and not a public, corporation, of which the commonwealth of Massachusetts was founder, and the visitatorial and all other powers, franchises, and rights of property of the college are vested in the boards of trustees and overseers, established by the charter, who have a permanent right and title to their offices, which cannot be divested, except in the manner pointed out in the charter. In the charter of the college, (section 16,) it is declared, that the legislature "may grant further powers to, or alter, limit, annul, or restrain any of the powers by this act vested in the said corporation, as shall be judged necessary to promote the best interest of the college." Under this clause the authority of the legislature of the state of Maine is confined to the enlarging, altering, annulling,

[1][Reported by Hon. Charles Sumner.]

or restraining of the powers of the corporation, and does not extend to any intermeddling with its property, or extinction of its corporate existence.

[Cited in Pennsylvania College Cases, 13 Wall. (80 U. S.) 220.]

[Distinguished in Lothrop v. Stedman, Case No. 8,519.]

5. By the act of separation of Maine from Massachusetts, the powers and privileges of the president, trustees, and overseers of the college, are guaranteed under the charter, so that they cannot be altered, limited, annulled, or restrained, except by judicial process, according to the principles of law, unless that act has been modified by the subsequent agreement of both states. Afterwards the legislature of Massachusetts passed a resolve, "that the consent and agreement of this commonwealth be, and the same is hereby, given to any alteration or modification of the above-mentioned clause or provision in said act, relating to Bowdoin College, not affecting the rights or interests of this commonwealth, which the president, and trustees, and overseers of the said college, or others having authority to act for said corporation, may make therein, with the consent of the legislature of said state of Maine; and such alterations or modifications, made as aforesaid, are hereby ratified on the part of this commonwealth." This resolve does not authorize the legislature of Maine to make alterations in the college charter, which shall divert the funds of the founder from their original objects, or vest the visitatorial power in any other bodies, or persons, than the trustees and overseers, marked out in the original charter; and, a fortiori, it does not justify the transfer of these powers from the trustees to any other persons not in privity with them.

6. According to the foregoing resolve, the alterations and modifications are to be made by the boards of the college, or by their agents, with the consent of the legislature, and not by the legislature, without their consent.

7. The terms of ratification in the foregoing resolve, being in praesenti, it seems that they cannot be applicable to all possible alterations in all future times.

8. By the terms of the act of separation of Maine from Massachusetts, no modification of it can be made, except by the subsequent agreement of the legislatures of both states. To effect this agreement, there must be a concurrence of the legislatures of both states ad idem, that is, an express assent to some specific proposition. Therefore the act of Maine of the 16th March. 1820, which was never responded to by the legislature of Massachusetts, and which in its terms does not look to any antecedent resolve of Massachusetts, (though the foregoing resolve of Massachusetts was passed four days previous,) but expressly looks to some future act or assent of Massachusetts, is not a sufficient compliance with the articles of separation.

9. By the act of Maine of the 16th of June. 1830, it is enacted, that "the president, and trustees, and the overseers of Bowdoin College shall have, hold, and enjoy their powers and privileges in all respects, subject, however, to be altered, restrained, or extended by the legislature, &c., as shall, &c., be judged necessary to promote the best interests of said institution." This cannot be construed to include an authority to annul the charter, or the corporation created by it, or the institution itself, or to create new boards, in whom the corporate powers and privileges may be vested; or to transfer to other persons the*powers and privileges of the old boards; or to add new members to the board by the nomination of the legislature, or by that of the governor and council of the state. The act of the 19th of March. 1821. enlarging the boards, the act of the 27th of

February, 1826, making the governor, ex officio, a member of the board of trustees, and the act of the 31st of March. 1831, declaring, that no person holding the office of president in any college in the state, should hold his office beyond the day of the next commencement of the college, and altering the tenure of their offices, are therefore unconstitutional.

10. Where the boards voted. that they "acquiesced" in an act of the legislature, it was held, that this did not import an assent on their part; and, farther, that their approval could not give effect to an unconstitutional act.

[Cited in Carr v. Hilton. Case No. 2,437; Slocomb v. Lurty, Id. 12,949.]

11. Where a person holds an office during good behavior, with a fixed salary and certain fees annexed thereto. the tenure of the office cannot be altered without impairing the obligation of a contract. Therefore, the act of the legislature of Maine of 1831, removing President Allen from the office of president, and establishing a different tenure for the office, is contrary to the constitution of the United States.

12. Where one man receives money, which ought to be paid to another, or belongs to another. an action of money had and received, will lie in favor of him. to whom of right the money belongs; and this, notwithstanding it may involve a trial of the title to an office, if the party has once been in possession.

[13. Cited in Townsend v. Jemison, 7 How. (48 U. S.) 721, to the proposition that a verdict does not cure defects not preceding or not necessary to its rendition. but those matters which were necessary are after the verdict presumed to have been shown.]

[14. Cited in Sala v. City of New Orleans, Case No. 12,246. to the proposition that a charter grant to a bank is a contract, the obligation of which cannot be impaired by subsequent legislation.]

[At law. Action of assumpsit by William Allen against Joseph McKean. Verdict for defendant, taken subject to opinion of the court, set aside, and verdict for plaintiff entered.]

This was an action of assumpsit for money had and received, brought by the plaintiff, who claimed to be president of Bowdoin College, against the defendant, who was treasurer of the college, for the recovery of the salary and perquisites of the office of president of the college. The following is an outline of the material facts of the case.

Bowdoin College was established in Brunswick, in the present state of Maine, by an act of the legislature of Massachusetts, passed on the twenty-fourth day of June, 1794. The act or charter of incorporation, after providing. that there should be erected and established a college, &c., to be under the government and regulation of two certain bodies politic and corporate in the act mentioned, proceeds in the second section to enact that certain persons, (naming them,) eleven in number, together with the president and treasurer of the college for the time being, be created a body politic by the name of the president and trustees of Bowdoin College, with perpetual succession. The third section declares, that the corporation so created, for the more orderly conducting the business thereof, shall have full power

and authority, from time to time, to elect a vice-president and secretary of the corporation, and to declare the tenures and duties of their respective offices; and also to remove any trustee from the same corporation, when in their judgment he shall be rendered incapable, by age or otherwise, of discharging the duties of his office, or shall neglect or refuse to perform them, and to fill up all vacancies in the corporation, &c.; provided, that the number of trustees, including the president and treasurer, shall never be greater than thirteen, nor less than seven. The fourth section confers on the corporation the usual powers of corporate bodies, and among others the power to hold real estate, the clear annual income of which shall not exceed £10.000. The fifth section authorizes them to elect a president, treasurer, professors, and trustees, and other college officers; to purchase lands, erect colleges, &c., and to make all reasonable regulations and by-laws, not repugnant to the laws of the state; and to confer degrees. The sixth section declares, that the clear rents, issues, and profits of all the estate, real and personal of which the corporation shall be seised or possessed, shall be appropriated to the endowment of the college, in such manner as shall most effectually promote virtue and piety, the knowledge of languages, and the useful and liberal arts and sciences, as shall be directed from time to time by the corporation. The seventh section proceeds to declare, that the acts of the corporation respecting elections, the purchase and erection of houses, the duties, salaries, and tenures of officers, the appropriation of moneys, the acceptance of conditional donations, the conferring of degrees, the making and altering of the rules and orders, &c. &c., shall not have any force or validity, until agreed to by the board of overseers created by the same act. The ninth section proceeds to appoint certain persons by name, (in number forty-three,) together with the president of the college, and the secretary of the corporation, the board of overseers of the college, creating them a body corporate with the usual powers, and among others with the power of amotion of the members of the board, and providing, that the board shall never be greater than forty-five, nor less than twenty-five. The sixteenth section provides, "that the legislature of this commonwealth may grant any further powers to, or alter, limit, annul, or restrain any of the powers by this act vested in the said corporation, as shall be judged necessary to promote the best interests of the said college." The seventeenth section grants to the college five townships of land, of the contents of six miles square, to be laid out and assigned from any of the unappropriated lands belonging to the commonwealth, in the then district of Maine, the same to be vested in the trustees of the college and their successors for ever, for the use, benefit, and purpose of supporting the college, with power to dispose of them, &c., and subject to certain conditions of settlement.

Such are the most material clauses of the charter. The lands so granted by the commonwealth have been vested in the corporation; and other donations have from time to time been received by it from the munificence of private individuals. The college boards, soon after the grant of the charter, were duly organized under the charter, and suitable arrangements were made, so that the college went into operation in the year 1801, and has ever since continued to perform the functions, for which it was established, in the promotion of sound literature, and the liberal arts and sciences. No alteration was ever proposed, or made to the charter, during the union of Massachusetts and Maine. But upon the separation of the latter, as an independent state, from the former, it was provided by the act of separation of the 19th of June, 1819, (which was incorporated into the constitution of Maine, which went into effect on the 15th of March, 1820,) among the fundamental articles, that "all grants of land, franchises, immunities, corporate, or other rights, &c., which have been or may be made by the said commonwealth before the separation, &c., shall continue in force, after the said district shall become a separate state. But the grant, which has been made to the president and trustees of Bowdoin College out of the tax laid upon the banks, &c., shall be charged upon the tax upon the banks within the said district of Maine, and paid according to the terms of the grants. And the president and trustees, and the overseers of the said college shall have, hold, and enjoy their powers and privileges in all respects, so that the same shall not be subject to be altered, limited, annulled, or restrained, except by judicial process according to the principles of law." And the ninth article of the same act declares, that the fundamental article shall be incorporated, ipso facto, into the state constitution, "subject, however, to be modified or annulled by the agreement of the legislature of both the said states; but by no other power or body whatsoever." With a view, doubtless, to meet the special security thus given to the rights and privileges of Bowdoin College, another article (the 8th) of the constitution of Maine declares, "that no donation, grant, or endowment, shall at any time be made by the legislature to any literary institution, now established or which may hereafter be established, unless at the time of making of such endowment, the legislature of the state shall have the right to grant any further powers to, alter, limit, or restrain any of the powers vested in any such literary institution; as shall be judged necessary to promote the best interests thereof."

By a vote passed by the trustees of the college in July, 1801, and duly concurred in by the

board of overseers, the salary of the president of the college was fixed at $1,000 per annum, (an addition of $200 was afterwards made in 1805,) to be paid in quarterly instalments, and to commence, when he shall enter on the duties of his office; and it has accordingly been constantly so paid by the treasurer, without any further order of either board, from time to time, to the president for the time being, without objection. By another vote of the college boards of November 4th, 1801, the tenure of the office of the president was declared to be during good behavior. By the by-laws of the institution, every candidate for a degree was required to pay five dollars to the treasurer for the president; and a like fee was subsequently required for every medical degree. Dr. Allen, (the plaintiff,) was duly elected president of the college in December, 1819; and in May, 1820, he was inaugurated, and assumed the duties of the office under this known tenure of office, and the salary and perquisites annexed thereto. In the same month, with the zealous co-operation of President Allen, the college boards passed a vote, which, after reciting the clause of the constitution of Maine as to endowments, already referred to, declared, that the consent of the boards be given, that the right may be vested in the legislature of the state of Maine, (that is, the right to enlarge, alter, limit, or restrain the powers given by the college charter,) and that a committee be authorized in behalf of the institution to take such measures as may be necessary to vest such right in the said legislature, so as to enable them to make the endowment thereby prayed for, or any further endowment, which they in their wisdom might be disposed to make. President Allen was appointed one of this committee; and accordingly application was made to the legislatures of Massachusetts and Maine for their assent to such modification of the college charter, as should enable the college constitutionally to receive patronage and endowments from the legislature of Maine. The legislature of Massachusetts accordingly passed a resolve on the 12th June, 1820, and the legislature of Maine one on the 16th of the same month, on this subject, the terms of which were fully discussed by the court. The legislature of Maine, supposing that by the conjoint operation of the state legislatures, all restraint upon their constitutional authority to alter the charter was removed, in March, 1821, passed an act providing, that the number of trustees of the college, including the president, should never be less than twenty nor more than twenty-five, and a quorum to be thirteen; and the number of overseers should never be less than forty-five nor more than sixty; that the governor and council should appoint twelve persons as trustees, and fifteen as overseers, &c. &c.; that the boards respectively should thereafter fill all other vacancies. Other acts were passed in June, 1820,

in February, 1822, and in February, 1826, respecting the college, upon the terms of which it is unnecessary to dwell. On the 31st of March, 1831, the act was passed, which has given rise to the present controversy. The first section declares, "that no person holding the office or place of president in any college in this state" (and there were at that time, and are now, but two colleges in the state,) "shall hold said office or place beyond the day of the next commencement of the college, in which he holds the same, unless he shall be re-elected. And no person shall be elected or re-elected to the office or place of president, unless he shall receive in each board two thirds of all the votes given in the question of his election. And every person elected to said office or place after the passing of this act, shall be liable to be removed at the pleasure of the board of trustees, or board of trustees and overseers, which shall elect him." The second section provides, "that the fees paid for any diploma, or medical or academical degree, &c., shall be paid into the treasury for the use of the college, and no part shall be received by any officer, as a perquisite of office." At the annual meeting of the boards of the college in September, 1831, they passed a vote, "that they acquiesce in said act, and will now, &c., proceed to carry the provisions thereof into effect." The board of trustees then proceeded, (after having given due notice to President Allen,) to an election of president; but no candidate having a majority of votes, no choice was made, and the college has ever since remained without any acknowledged president. The present action has been brought by Dr. Allen, against the defendant, who is treasurer of the college, for the salary and perquisites of office due to him (as he contends) as president of the college, de jure, notwithstanding his ejection from office in September, 1831.

Greenleaf, for plaintiff.

The corporation of Bowdoin College is in its nature a private eleemosynary corporation. This is manifest from the terms of the charter; the legislature having reserved to itself the right to alter or annul the powers therein granted. If it were a public corporation, such reservation would be superfluous. It was so treated in the separation act, and in the constitution of Maine, by which the rights and privileges of this college were placed beyond the reach of the legislature. The purpose of general education did not make it a public corporation. [Dartmouth College v. Woodward,] 4 Wheat. [17 U. S.] 631, 667. The charity of almost every hospital and college may be public, while the corporation is private. 2 Kent, Comm. 222, 223; Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 634; Philips v. Bury, 2 Term R. 346, note. The great object of an incorporation is to bestow the character and properties of individuality on

a collective and changing body of men. [Providence Bank v. Billings,] 4 Pet. [29 U. S.] 562. And wherever the acceptance of the charter is necessary to give operation to the act of the government, it is a private corporation. Ang. & A. Corp. 46. Such acceptance created a contract between the state and all parties interested in the college. Lincoln & Kennebec Bank v. Richardson, 1 Greenl. 81. The property granted to the college became private property, out of which any judgment against the corporation might be satisfied; and which the state could not resume, nor again acquire, but for public uses. and upon the payment of compensation. And the contract thus created could not be rescinded, nor the rights vested under it be devested, by any act of the legislature. Fletcher v. Peck, 6 Cranch, [10 U. S.] 87; New Jersey v. Wilson, 7 Cranch, [11 U. S.] 164; King v. Dedham Bank, 15 Mass. 454; Charles River Bridge v. Warren Bridge. 7 Pick. 344; Society for Propagation v. Wheeler, [Case No. 13,156;] Dash v. Van Kleeck, 7 Johns. 477; Terrett v. Taylor, 9 Cranch. [13 U. S.] 43. The college thus erected consists of two distinct corporations; namely, the president and trustees, and the board of overseers. The latter is, in the sixth section, styled "the supervising body," having a negative on the acts of the president and trustees, and possessing all the essential attributes of visitor of the college. The right of visitation is evidently granted away by the state to the board of overseers. The two corporations are empowered, by the charter, to elect a president and other officers; "and to determine the duties, salaries, emoluments, and tenures of their several offices aforesaid." The power of amotion, for just cause and in a legal manner, may be considered as granted by necessary implication; such power being one of the incidents of every corporation. Per Lord Mansfield in Rex v. Richardson, 1 Burrows, 539; Lord Bruce's Case, 2 Strange, 819; Rex v. Lyme Regis, 1 Doug. 149; Ang. & A. Corp. 410, 413, 246. In the exercise of these powers, the college declared the tenure of the office of president to be during good behavior; and fixed his salary; and the invariable usage, proved in the case, and amounting to a contemporaneous practical exposition of the vote, has been to pay it quarterly; generally without demand, and always without any special order of the corporation or its officers. Certain perquisites also were directed by the by-laws to be paid by candidates for degrees, "to the treasurer for the president." This office, moreover, being of the essence of the corporation. the incumbent had a franchise in it. Dighton's Case. 1 Vent. 77. 82. The place also of trustee, which he held virtute officii, though no emoluments were attached to it, is a franchise. And in either case the party unlawfully put out may be restored by mandamus. Fuller v. Trustees of Plainfield Academic School, 6 Conn. 532. From these premises it results, that the acceptance of the office of president created a private contract of service between the plaintiff and the college, which neither party, nor the legislature could annul or impair. He was an officer of private instruction; as truly so as the principal of a private academy, and his rights were as absolutely vested. Having been thus elected, and having performed the duties of his office, the plaintiff is entitled to his salary and perquisites; for the recovery of which the proper remedy is by action against the treasurer, for money had and received. It is in evidence, that the treasurer had in his hands sufficient funds for this purpose; that the salary was payable quarterly; and that by the usage of his office, and the practice of the college, no special order was required for the payment. It was therefore, at the end of each quarter, the money of the president, in the hands of the treasurer, who became his trustee for the sums he was entitled to demand, whenever they became payable. And the payment to the president would have been a conclusive answer to any action brought by the college against its treasurer for the same money. It is simply the case of money deposited with A, to be paid over to B; who may always recover it of A. in this form of action. Scott v. Surman, Willes, 404; Com. Cont. 270; Heard v. Bradford, 4 Mass. 326; Oliver v. Smith, 5 Mass. 183; Hall v. Marston, 17 Mass. 575; Eagle Bank v. Smith, 5 Conn. 71; Arris v. Stukely, 2 Mod. 260; Boyter v. Dodsworth, 6 Term R. 681; Hearsey v. Pruyn, 7 Johns. 179; Sadler v. Evans, 4 Burrows, 1984. The authority of Maine to modify the college charter, upon which the defence in the present case is understood to be founded, is supposed to be derived from the transactions of the corporations, and of the two states in the year 1820; but upon an examination of those acts, no such authority will be found to have been given. Massachusetts, by its resolve of June 12th, 1820, consented to such alterations of the charter, not affecting the rights and interests of the commonwealth, as the president and trustees, and the overseers, or their agents might make, with the consent of the legislature of Maine. It contemplated specific alterations, to be originated from time to time, by the college or its immediate agents, remote from the influence of popular excitement and the strife of party; which, being submitted in a matured form to the legislature of Maine, might with its approbation. become a law. But, instead of this, the corporations were understood by the legislature of Maine to have sold out to this state the whole trust confided to them, with the right to originate and establish alterations at its pleasure; thus exposing the college to all the storms of political and sectarian violence in a legislative assembly. Under this impression, and without acting

on the proposal of the parent state, Maine passed the subsequent act of June 16th, 1820, taking to itself the right to modify the charter at its pleasure, and making the act to take effect, provided Massachusetts shall consent thereto. This consent never has been given; and as no provision is made for securing the rights or interests of Massachusetts, its consent is not to be presumed. Its plain intent, in the resolve of June 12th, has evidently been disregarded; and neither state has acted on the proposition of the other. Hence all the subsequent legislation of Maine in relation to the college is merely void, and the college still enjoys the immunity secured to it by the constitution.

The assent of the plaintiff is, in this view, of no importance. It could not give to the state a jurisdiction, which the constitution had inhibited; nor surrender the rights of Massachusetts, over which he had no control. But if the law of 1820 were a valid act, it would not justify the ulterior proceedings of Maine. It gives authority to "alter, limit, and restrain, or extend the powers and privileges" of the corporations. The powers of a corporation are those things which it may lawfully do; its privileges are those things which it may lawfully enjoy. Hence the legislature could only modify the capacities of the corporations. It could not do corporate acts in their stead. It could neither make by-laws, nor create trustees nor overseers, nor displace any member of the corporation. If it might limit powers, it could not assume to exercise them. If it might invigorate the arm, it could not cut it off. Therefore the act of March 19th, 1821, authorizing the governor and council to appoint twelve additional trustees and fifteen overseers, and to fill certain vacancies, is void; it being not within the authority professedly granted, and being also a direct exercise of corporate powers. And the subsequent acts of the corporations are vitiated by the votes of these newly appointed trustees and overseers, unless it is made apparent, that such votes could not affect them. Nor can the defence be supported by the statute of 1832, c. 517; for this act also is in violation of the constitution, both of Maine and of the United States. Its provisions are obviously pointed at President Allen, since the language cannot apply to the other college in this state, which has no board of overseers. It is, in effect, an act to remove him from office. It destroys his vested right in the office, and violates the contract of his election, by creating a new tenure of the office, which, till then, was held during good behaviour. It places the contract wholly in the power of one party. It is an exercise of the power of amotion; and this, too, without notice or judgment of law. But even the corporation could not remove from office till after notice to appear and show cause. Ang. & A. Corp. 244; Fuller v. Trustees of Plainfield. 6 Conn. 532. And the no-

tice should specify the charges preferred against the incumbent. Exeter v. Glide, 4 Mod. 33, 37. It ousts the plaintiff from his franchise, as a trustee and overseer, without judgment of law, and without any offense on his part. Com. v. St. Patrick's Benevolent Soc., 2 Bin. 449, 450; 2 Kent, Comm. 239; Ang. & A. Corp. 244; Dartmouth College v. Woodward. 4 Wheat. [17 U. S.] 518. It is a direct and original exercise of corporate powers. And it transcends even the limits of the act of 1820, which permits the legislature to modify the powers of the corporation, but not to annul them. Yet this statute annuls the powers of the college to grant fees and perquisites to the president, and to fix the tenure of his office; which were secured to the corporations by the original charter. In fine, constituted as this college was, with duties so important, and privileges so valuable, the right of control, reserved to the legislature, should be exercised with extreme caution; and should be so limited as to promote the original and peculiar objects of the foundation, and to enlarge rather than restrain the benefits of its relation to the public.

Longfellow for defendant.

The preliminary inquiry in this case is, whether the action can be maintained against this defendant. He is charged, it is true, as the treasurer of the college; but this is merely descriptio personae. He is not the corporation, but its agent; receiving its money in that character alone. His exhibits show, that the sums he received were "for the corporation," and not for the president. He has charged himself with the amount, and is liable to the corporation alone. The privity of contract, on which this action is to be maintained, if at all, is between the plaintiff and the college. If the treasurer had wasted the moneys in his hands, will it be contended, that the plaintiff would have no remedy against the college? On the other hand, if the corporation were insolvent, is the treasurer therefore liable de bonis propriis to the plaintiff? His situation involves no other responsibilities than those of the cashier of a bank, having received the amount of a note left in the bank for collection; in which case the remedy of the depositor would be against the corporation, and not against its servant. The moneys received "for the president" went into the common mass of the college funds, the legislature, by the act of 1831, having repealed the by-law by which he formerly had received them. And in this act both the corporations had acquiesced, and were therefore bound by its provisions, which they had in fact attempted to carry into effect. The authorities cited by the plaintiff in support of the action, may be answered by the single remark, that they all are cases of money received by the party in his private capacity, and not by virtue of any office, like that of

the present defendant. They therefore furnish no support to this action. But if this action would lie, under other circumstances, yet this plaintiff cannot maintain it, not being the president of the college. He was removed from office by the operation of the act of 1831; which it was the constitutional right of the legislature to pass. For the college is in every respect a public institution. It was originally established and endowed by the state; the legislature reserving the right to modify and even to annul its charter. In each of these essential particulars it differs from Dartmouth College; and therefore the case of that college furnishes no analogy for the decision of this. Bowdoin College, it is true, has received munificent donations from the Bowdoin family; but these gifts were made to an institution already established by the public, and do not, in any degree, make it a private corporation. Neither is it private because trustees have been appointed to manage its concerns. This power must be vested somewhere; and the effect is the same whether it is exercised immediately by the legislature, or more remotely by agents of its appointment. Every institution, whether hospital or college, created and endowed by the government, as this was, for purposes of general charity, is a public corporation. The subsequent gifts of private benefactors, without statutes directing their employment, are engrafted into the original foundation, but do not change its character. The state, as the founder, still retains the visitatorial power; and may restrain and control the trustees, should they abuse their trust. St. John's College v. Todington, 1 Burrows, 200. This power of the state may be farther argued from the patronage it has bestowed; the visitation always following the patronage. [Dartmouth College v. Woodward,] 4 Wheat. [17 U. S.] 675. In the present instance it has also been expressly reserved.

It is conceded, that the legislature has not the right to "annul" the corporation; but it may take away any of its powers, and substitute others, whenever it may deem the interests of the institution to require it. Or it may lawfully resume to itself the power of appointing to office, fixing tenures, and filling vacancies in the corporations. Of the expediency of such a measure, it is not necessary now to speak; but the existence of the power, and the right to exert it, are clear. It was to an office subject to this legislative control, that the plaintiff was elected. Though a provision for the immunity of the college was inserted in the act of separation, yet he was aware that its effect might be done away by the joint power of the two states. And if, by a joint act, they have modified the condition of the college, pursuant to such known powers, he has no right to complain. Nay more, it is proved that he himself procured the passage of the act of 1820, of which he was strongly in favor;

and his assent being, not merely his official, but his private act, he is subject to all its consequences. The argument against the binding force of the act of 1820, founded on the supposed want of assent on the part of Massachusetts, proceeds on a construction altogether too narrow. The meaning of all parties was, only that the power of control should not be assumed by Maine, without the consent of Massachusetts. Whether the restriction was expressed by the words "shall agree," or "shall have agreed," is wholly immaterial; as is farther evident from the fact, that Massachusetts, in the same statute, engaged to ratify whatever arrangements should be made between the corporation and the new state. And the corporation having instructed its committee to vest the power of control in the legislature of Maine, and this state having accepted and exercised the power thus granted, it has therefore been ratified by Massachusetts, and the act is binding. If it be true, that alterations should originate with the president and trustees, this has been done. The committee, who addressed the legislature of Maine, communicated the terms of a modification originally proposed by the corporations of the college. The condition of the college, after the passage of the act of 1820, was the same as it was under the original charter, and before the separation, excepting the power to annul. Hence the enlargement of the two boards, under the act of 1821, was within the purview of the terms of the surrender in the preceding year. The legislature might lawfully have gone farther, and assumed to itself the right to fill all vacancies. But if this power were doubtful, it has been ratified by the college; and the right can no longer be questioned. Had either corporation been disposed to resist, its dissent should have been expressed at the time. Instead of which, the members newly admitted have been tacitly recognized by each board, as legally entitled to their seats; and twelve years of profound acquiescence by all parties have already elapsed, affording the strongest presumptive proof of assent to the statute. This is one of the arrangements to which the ratification of Massachusetts is to be extended. If, however, these members were not legally appointed, it would not follow, that their votes vitiated the subsequent transactions of the boards, unless it should appear, that such measures were actually decided by their votes. And the burden of this proof is on the plaintiff, the legal presumption being in favor of their validity. The act of 1831 is nothing more than a legitimate exercise of the powers vested in the state by the statute of 1820. It violates no vested rights of the plaintiff, for he accepted the office of president, subject to the legislative right of modification. To this right he personally assented. The statute does not remove him from office; but merely declares, that no president shall

hold his office unless re-elected. The amotion resulted from the act of the trustees and overseers, under the statute. But whether it resulted from a corporate or a legislative act, it is legal, being only an exercise of visitatorial power. And no notice was necessary, it being a public and not a private corporation. Neither is this statute void, as impairing the obligation of a contract. All presumptions and doubts must lean in favor of its constitutionality. It would be dangerous to presume otherwise. The unconstitutionality of any statute must be clearly manifest, to justify any court in so pronouncing it. Is such the character of this statute, so solemnly enacted, and so deliberately assented to, by those whose obedience was required to its provisions?

Greenleaf, in reply. The treasurer, in his exhibit, states, that the perquisites were received "for the corporation;" but the law says, he received them "for the president." If the latter is entitled to them, he may recover them in this action. They were originally paid to him by the persons graduated; and afterwards, from motives of convenience and decorum, were paid to the treasurer for his use. For the salary, at least, the plaintiff has a double remedy; either against the corporation, as the contracting party, or against the treasurer, as trustee to his use. The supposed acquiescence of the corporation in the act of 1831, was merely a silent submission to superior force. However mistaken the policy which dictated this submission, it was nothing more than the bending of the rush before the tempest. It can never amount to a deliberate and voluntary adoption of the extraordinary enactments of that statute, as a lawful amendment of the college charter. The state is not the visitor of this corporation. All the attributes of a visitor are, by the sixth and seventh sections of the original charter expressly vested in the board of overseers, as "a supervising body." The legislature reserved no such right to itself, nor has it ever been withdrawn from the overseers.

STORY, Circuit Justice. This cause has been argued with a degree of learning and ability proportionate to its importance. I have taken time to consider it, and propose now to deliver the judgment, which, upon mature deliberation, I feel bound to adopt.

Two questions have been made at the bar. First, whether the present action is maintainable against the defendant, as treasurer, supposing the plaintiff still to be rightfully in office. Secondly, whether the plaintiff is rightfully in office, notwithstanding the act of 1831, and the proceedings of the board thereupon; so that he is entitled to recover the amount of his salary and perquisites, or either, against the college.

A strong desire has been expressed at the bar in behalf of the parties, that the court would not, even if it might, confine its judgment to the first question; but that it would proceed to decide the whole merits of the controversy, as essential to the good order and prosperity of the college, as well as to the rights of the defendant. Under these circumstances, although I am conscious of the delicacy and difficulty of the task, (a task, from which I would gladly have been spared,) I shall express the opinion, which I have deliberately formed upon both the questions in the case without hesitation, but at the same time with all the diffidence, which the magnitude of the interests involved in them cannot fail to create. For the present, I shall pass the question, whether the action is maintainable against the present defendant, and proceed at once to the main points upon the merits. And the first point naturally arising upon the discussion is, in what light the original charter granted by Massachusetts for the establishment of Bowdoin College, is to be viewed. Is it the erection of a private corporation for objects of a public nature, like other institutions for the general administration of charity? Or is it, in the strict sense of law, a public corporation, solely for public purposes, and controllable at will by the legislative power, which erected it, or which has succeeded to the like authority? The former is asserted by the plaintiff's counsel to be its true predicament; the latter is as strenuously contended for on the other side.

That a college established for the promotion of education, and for instruction in virtue and piety, and in the liberal arts and sciences, is in some sense a public institution or corporation, cannot well be denied; for it is for the benefit of the public at large, or at least for all persons, who are suitable objects of the bounty; and this is the popular sense, in which the language is commonly used. And in this sense an institution founded exclusively by private donors for purposes of general charity, such as a hospital for the poor, the sick, the disabled, or the insane, may well be called a public institution. But in the sense of the law a far more limited, as well as more exact, meaning is intended by a public institution or corporation. Upon this subject, however, I may well spare myself from any elaborate exposition, since it was fully considered in the great case of Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 518, from which I will make a quotation, contained in the opinion of one of the judges, which it is well known had the approbation of the court: "Public corporations," says the opinion, "are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests. But, strictly speaking,

public corporations are such only, as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under a charter of the government, the corporation is private, however extensive the uses may be, to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own use, whose stock is exclusively owned by the government, is. in the strictest sense, a public corporation. So is a hospital created and endowed by the government for general charity," (meaning, as is obvious from the context, a hospital like the Navy Hospital, or the General Marine Hospital, established and supported by the United States out of its own funds, and over which it retains the entire government.) "But a bank, whose stock is owned by private persons," (and it might have been added, partly by private persons and partly by the government.) "is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge, and turnpike companies. In all these cases the uses may, in a certain sense, be called public; but the corporations are private; as much so, indeed, as if the franchise were vested in a single person." "This reasoning applies in its full force to eleemosynary corporations. A hospital, founded by a private benefactor, is in point of law a private corporation, although dedicated by its charter to general charity. So is a college, founded and endowed in the same manner, although, being for the promotion of learning and piety, it may extend its charity to scholars from every class of the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities; and cannot be shaken, but by undermining the most solid foundations of the common law." It is afterwards added: "The fact, then, that the charity is public, affords no proof, that the corporation is also public; and consequently the argument, so far as it is built upon this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation, a doctrine irreconcilable with the whole current of decisions since the time of Lord Coke." And it is further stated, that no authority exists in the government to regulate, control, or direct a corporation, or its funds, "except where the corporation is in the strictest sense public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself." See [Dartmouth College v. Woodward.] 4 Wheat. [17 U. S.] 668–672.

That a college, merely because it receives a charter from the government, though founded by private benefactors, is not thereby constituted a public corporation, controllable by the government, is clear beyond any reasonable doubt. So the law was understood by Lord Holt, in his celebrated judgments in Philips v. Bury, 1 Ld. Raym. 8, 2 Term. R. 346. Lord Hardwicke, in Attorney General v. Pearce, 2 Atk. 87, said: "The charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be." And the decision of the supreme court, in the case of Dartmouth College v. Woodward. is direct to the same purpose.

Nor does it make any difference, that the funds have been generally derived from the bounty of the government itself. The government may as well bestow its bounty upon a private corporation for charity, as upon a public corporation; and its funds once bestowed upon the former become irrevocable, precisely in the same manner, and to the same extent, as if they had been bestowed upon an individual. The government cannot resume a gift, once absolutely made to a private person; neither can it resume a like gift to a private corporation. It is true, that the government may reserve such a power in granting a charter, if it chooses so to do; but, then, the power arises from the very terms of the grant, and not from any implied authority derived from the bounty being for general charity, any more than it would from its being for private charity. The government may reserve a right to revoke at pleasure even its private gifts; but certainly the law will not imply such right without some positive expression of such an intention. Mr. Chancellor Kent has stated the true principles of law on this subject, with his usual accuracy and clearness: "An eleemosynary corporation," (says he,) "is a private charity, constituted for the perpetual distribution of the alms and bounty of the founder. In this class are ranked hospitals for the relief of poor, sick, and impotent persons, and colleges and academies established for the promotion of learning and piety, and endowed with property, by public and private donations." 2 Kent, Comm. (2d Ed.) Lect. 23, p. 274. To be sure, where the government is the founder of a college, it has certain rights and privileges attached to it in point of law; but in this respect it is not distinguishable from any private founder. Every founder of an eleemosynary corporation, (that is, the fundator perficiens, or person, who originally gives to it its funds and revenues,) and his heirs, have a right to visit, inquire into, and correct all irregularities and abuses, which may arise in the course of the administration of its funds, unless he has conferred (as he has a right to do) the power upon some other person. This power is commonly known by the name of the visitatorial power, and it is a necessary incident to all eleemosynary corporations; for, these corporations being composed of indi-

viduals, subject to human frailties, are liable, as well as private persons, to deviate from the end of their institution; and therefore ought to be liable to some supervision and control. 1 Bl. Comm. 480. But, what is the nature and extent of this visitatorial power? Is it a power to revoke the gift, to change its uses, to devest the rights of the parties entitled to the bounty? Certainly not. It is a mere power to control and arrest abuses, and to enforce a due observance of the statutes of the charity. Lord Holt, in Philips v. Bury, 2 Term R. 352, says: "The visitatorial power is an appointment of law. It ariseth from the property, which the founder had in the lands assigned to support the charity; and, as he is the author of the charity, the law gives him and his heirs a visitatorial power, that is, an authority to inspect the accounts, and regulate the behavior of the members, that partake of the charity; for it is fit the members, that are endowed, and that have the charity bestowed upon them, should not be left to themselves, (for divisions and contests will arise amongst them about the dividend of the charity,) but pursue the intent and design of him that bestowed it upon them."

But the founder may part with his visitatorial power, and vest it in other persons; and when he does so, they exclusively succeed to his authority. No technical terms are necessary to assign over, or vest the visitatorial power. It is sufficient, if, from the nature of the duties to be performed by particular persons under the charter, it can be inferred, that the founder meant to part with it in their favor; and he may divide it among various persons, or subject it to any modification or control by the fundamental statutes of the foundation.[2] Now, it is a general rule in the construction of charters, that if the objects of the charity are not incorporated, but certain trustees are incorporated to manage the charity, the visitatorial power is deemed to belong to such trustees in their corporate capacity.[3] And so the law is laid down by Lord Holt in Philips v. Bury, 2 Term R. 352, 353. This visitatorial power is an hereditament, founded in property, and valuable in the intendment of law; and where it is vested in trustees, there can be no amotion of them from their corporate capacity, and no disturbance or interference with the just exercise of their authority, unless it is reserved by the statutes of the foundation or charter. But, still, as managers of the revenues of the charity, they are not beyond control; but are subject to the general superintendence of a court of chancery, for any abuse of their trust in

the management of it. If, with these principles in view, we examine the charter of Bowdoin College, we shall find, that it is a private and not a public corporation. It answers the very description of a private college, as laid down by Mr. Chief Justice Marshall, in Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 640, 641. It "is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors to the objects of that bounty. Its trustees were originally named by the founder, and invested with the power of perpetuating themselves. They are not public officers; nor is it a civil institution; but a charity school, or a seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation." The commonwealth of Massachusetts is its founder, having given it its original funds. But it is made capable of receiving, and has actually received, funds from the bounty of private donors. As founder, the commonwealth of Massachusetts would have possessed the visitatorial power, if it had not intrusted that, and all other powers, and franchises, and rights of property of the college, to the boards of trustees and overseers established by the charter, and in the manner therein stated. As soon as that charter was accepted, and carried into operation, by the trustees and overseers named in it, they acquired a permanent right and title in their offices, which could not be devested, except in the manner pointed out in that charter. The legislature was bound by the act; they could not resume their grant; and they could not touch the vested rights, privileges, or franchises of the college, except so far as the power was reserved by the 16th section of the act. The language of that section is certainly very broad; but it is not unlimited. It is there declared, that the legislature "may grant further powers to, or alter, limit, annul, or restrain any of the powers by this act vested in the said corporation, as shall be judged necessary to promote the best interest of the college." Whatever it may do, then, must be done to promote the best interest of the college. It is true, that it is constituted the sole judge, what is the best interest of the college; but still it cannot do any thing pointedly destructive of that interest. Its authority is confined to the enlarging, altering, annulling, or restraining of the powers of the corporation. It cannot intermeddle with its property; it cannot extinguish its corporate existence; it cannot resume all its property, and annihilate all its powers and franchises. The legislature must leave its vitality and property, and enable it still to act as a college. It cannot remove the trustees, or overseers, though it may abridge, as well as enlarge, their powers. At least, any argument. which should attempt to establish a different doctrine, must proceed upon

---

[2] Dartmouth College v. Woodward, 4 Wheat. [17 U. S.] 675; Philips v. Bury, 2 Term R. 350, 352, 353.

[3] Id.; Green v. Rutherforth, 1 Ves. Sr. 472; Attorney General v. Middleton, 2 Ves. Sr. 327; Case of Sutton's Hospital, 10 Coke, 23, 31; 2 Kent, Comm. (2d. Ed.) p. 300, § 23 et seq..

the difficult assumption, that a power "to promote the best interest of the college," included a power to destroy all its interests, nay its very existence. But it is unnecessary to enlarge upon this topic, since the present case does not rest upon the effect of this clause of the original charter. The act of separation, which is constitutionally binding upon the legislature of Maine, gives, as we have seen, a complete guaranty to the powers and privileges of the president, trustees, and overseers, under the charter; so that they are incapable of being altered, limited, annulled, or restrained, except by judicial process according to the principles of law, unless that act has been modified by the subsequent agreement of the legislatures of both states.

The next inquiry naturally is, whether any such modification has been made, as is contemplated by the act of separation. If it has, another inquiry will be, what is the true extent of the modification actually made and authorized. The resolve of the legislature of Massachusetts was passed, as we have seen, on the 12th day of June, 1820. After reciting the clause in the act of separation, above referred to, and the petition of the trustees and overseers of Bowdoin College for such a modification of that clause, as would enable the legislature of Maine to make donations, grants, and endowments to the college, it is resolved, "That the consent and agreement of this commonwealth be, and the same is hereby, given to any alteration or modification of the aforementioned clause or provision in said act relating to Bowdoin College, not affecting the rights or interests of this commonwealth, which the president and trustees, and overseers of the said college, or others having authority to act for said corporation, may make therein with the consent of the legislature of said state of Maine; and such alterations or modifications, made as aforesaid, are hereby ratified on the part of this commonwealth." Now, whether this resolve is exactly in conformity to the petition of the trustees and overseers, and carried into effect their objects, or not, is a point wholly unnecessary to be here discussed; for the state of Massachusetts had a right to prescribe such terms, as it pleased; and was not bound to grant what was asked, but what it deemed in its discretion fit to be granted. We must, then, construe the resolve, as we should any other solemn act of legislation, according to its true intent to be collected from its terms. Now, it is very clear, that Massachusetts was not willing to make an unconditional surrender of all rights and interests under the charter to the legislature of Maine; for an express exception or reservation is made of alterations or modifications "affecting the rights and interests of the commonwealth," under the clause of the act of separation. The very exception or reservation supposes, that there are some rights and privileges and interests of the commonwealth, arising under the charter; for otherwise the language of the exception or reservation would be useless, if not absurd. Nor is it difficult to perceive, that the commonwealth of Massachusetts had rights, privileges, and interests, which might be affected by certain alterations of the charter. In the first place, the commonwealth was the founder of the college, and had given certain lands to be appropriated to the uses of the charity. It had a right and interest in having these funds perpetually applied to the original objects of the institution. As founder, too, it was entitled to the visitatorial power over the college; and having delegated that power to certain trustees and overseers in perpetual succession, as its chosen, substituted agents and visitors, it had also a right and interest in having that power perpetually exercised by the very bodies, and by none others, which it had constituted for this purpose. Nothing is clearer in point of law, than the right of a founder to have his visitatorial power exclusively exercised by the very functionaries, in whom he has vested it. It is the very substratum of his dotation.

This is not all. The founder has a right to have the statutes of his foundation, as to the powers of the trustees, strictly adhered to, except so far as he has consented to any alteration of them. But an authority to alter or modify those powers can never be fairly construed into an authority to take them away from his trustees, and confer the same powers on other persons. My view of this resolve, therefore, is, that it authorizes no alterations or modifications of the college charter, which shall divert the funds of the founder from their original objects, or shall vest the visitatorial power in any other bodies, or persons, than the trustees and overseers marked out in the original charter; and a fortiori, that it does not justify the transfer of these powers from the trustees to any other persons not in privity with them. It does not authorize the legislature of Maine to assume to itself the powers of the trustees, or overseers, or either of them, or to appoint new trustees or overseers; for that would affect the rights and interests of the founder, who has a right to select his own administrators of his own bounty in perpetuity. I do not say, that the legislature of Maine might not have authorized an increase of the number of both boards, leaving the appointment to be made by the existing boards; for that would still leave the funds to be administered by agents selected by the proper visitors of the founder. Upon that point I give no opinion. What I do mean to say is, that the legislature of Maine was not authorized by this resolve of Massachusetts to affect the rights and interests of the latter state, by making appointments of trustees and overseers of the charity through its own agency, and independent of the agency of the charter trustees, and overseers. Massa-

chusetts has nowhere therein given any assent to such an alteration or modification of the charter of the college.

But this is not all. The language of the resolve is, that Massachusetts assents and agrees to any alteration and modification, "which the president and trustees, and overseers, of said college may make therein, with the consent and agreement of the legislature of said state of Maine; and such alterations or modifications, made as aforesaid, are hereby ratified on the part of this commonwealth." Now, I confess, that I think there is great force in the argument, that this resolve had in view certain alterations and modifications, then to be made, uno flatu, and not any subsequent alterations and modifications, which might from time to time, and in all future times and ages, be made in the charter. It is scarcely conceivable, that Massachusetts should use terms of ratification in presenti, as applicable to all such possible alterations in all future times. That was not necessary to accomplish the objects of the petitioners. A single alteration or modification, which should confer upon the legislature of Maine the authority required by the constitution to authorize any donation, grant, or endowment of that legislature to the college, would have been sufficient, without any general and sweeping authority for unlimited changes. But, be this as it may, it is very clear, that Massachusetts has not assented or agreed to any alterations or modifications, which the legislature of Maine might in virtue of its own sole authority make, but to such only, as the president and trustees, and overseers, of the college may make with the consent and agreement of the legislature of Maine. The alterations and modifications are, then, to be made by the boards of the college, or by their agents, with the consent of the legislature, and not by the legislature without their consent. It short, the alterations or modifications are to originate with the boards, and to be made by them; but they are inoperative, unless ratified by the legislature. If, therefore, the legislature of Maine has undertaken to make laws, altering or modifying the charter of the college, without making the validity of such laws dependent upon the adoption of the boards before or after their passage, I have no hesitation in saying, that such laws have never been assented to by Massachusetts, and are, consequently, unconstitutional and void.

But let us see, whether the legislature of Maine has adopted this resolve of Massachusetts; for there must be a concurrence of the legislatures of both states ad idem, to repeal or modify the clause in the act of separation. It is very certain, that the legislature of Maine has passed no correspondent resolve or act, in totidem verbis, nor has it in terms assented or agreed to the resolve of Massachusetts. How, then, can the resolve have any operation? The act of sepa-

ration declares, that the fundamental articles, the terms and conditions of the separation, shall be, ipso facto, incorporated into the constitution of Maine, "subject, however, to be modified or annulled by the agreement of the legislatures of both the said states." To constitute such an agreement, both parties must assent to the same thing. The whole proposition must be adopted, or nothing. From the very nature and force of the term, an agreement can be but one thing; and in that one thing, both parties must concur. If, then, Massachusetts and Maine have not agreed to the same identical thing, the casus foederis has not arisen. Indeed, I am inclined to go much farther. I do exceedingly doubt, if any modification or amendment can be made in any of these fundamental articles, without the specific modifications or amendment being drawn out, and expressly assented to by both states. I do not think, consistently with the letter or spirit of the qualifying or enacting clause, that the legislature of either state can delegate to other persons its authority to assent to, or frame, any such agreement. It cannot agree, ab ante, to any modifications or amendments, which third persons may make. It must agree to some specific proposition, purporting to be its own final act in the premises.

But, it is argued, that the act of Maine of the 16th of March, 1820, (which was passed four days after the Massachusetts resolve,) contains a virtual assent to that resolve, and that therefore there has been a sufficient compliance with the requisites of the articles of separation. Let us see, then, what the purport of that act is. It is entitled "An act to modify and limit the terms and conditions of the act of separation, relative to Bowdoin College, and encourage literature, and the arts and sciences;" and it enacts, "that, provided the legislature of Massachusetts shall agree thereto, the president and trustees, and the overseers, of Bowdoin College having already assented thereto, the terms and conditions mentioned in the act of the commonwealth of Massachusetts, passed on the 19th of June, A. D. 1819, entitled, &c., be and the same hereby are so far modified, limited, or annulled, as that the president and trustees, and the overseers, shall have, hold, and enjoy their powers and privileges in all respects, subject, however, to be altered, limited, restrained, or extended by the legislature of the state of Maine, as shall by the said legislature be judged necessary to promote the best interests of said institution." Now, it seems to me, that this act is precisely in the form contemplated by the act of separation, in order to justify a modification of the charter. It presents a specific alteration for the consideration and agreement of Massachusetts; and thus affords a very strong confirmation of the view, which has been already taken of this point by the court. The act is to take effect, and the modification is to be incorporated into the

charter, provided the legislature of the commonwealth of Massachusetts shall agree thereto, that is, to the specific modification proposed in the act. Now, it is certain, that the act of Maine, or the specific modification of the charter therein proposed, has never been agreed to by the legislature of Massachusetts. The act has never, as far as any of us know, been laid before the legislature of Massachusetts, either for consideration or for confirmation. The act does not look to any antecedent resolve of Massachusetts, and dispense with any farther assent; but it expressly looks to some future act or assent of Massachusetts. The language is, provided the legislature shall agree thereto, not has agreed thereto. Nor is this a mere matter of form. It is, in my judgment, a matter of substance, and was so rightly understood by the legislature of Maine, as indispensable to the constitutional efficacy of the act of 1820. In no just sense can this act be construed to be an adoption of the Massachusetts resolve. The terms are not the same; the objects are not the same; the limitations are not the same. Massachusetts signifies her assent to any alteration or modification "not affecting the rights and interests of this commonwealth." No such qualification or limitation is to be found engrafted on the act of Maine. The latter saves no rights and no interests of Massachusetts. Massachusetts signifies her assent to any alterations, &c., which the president, trustees, and overseers, &c., may make in the charter, with the consent and agreement of the legislature of Maine. The act of the latter assents to no such general authority; but confines itself to a single proposition; and that conceived almost in the very terms of the eighth article of the constitution of the state. It is impossible, therefore, in an exact and legal sense to assert, that the resolve of Massachusetts, and the act of Maine, speak ad idem. The proposition of neither legislature has been specifically acted upon by the other. There has been a miscarriage of the parties, unintentional, in all probability, but not, in my judgment, the less fatal on that account.

But although I am clear in this opinion, it is not my intention to rest the present case upon this ground alone, though it seems to me impregnable. There is another point of view in which the constitutional doctrine is equally clear, and equally fatal. Let it be conceded, that the act of Maine of the 16th of June, 1830, is constitutional, and has become incorporated into the charter of the college, and there yet remains a very important inquiry; what is the true extent of the authority of the legislature conferred by that act over the college? The words are, that "the president and trustees, and the overseers, of Bowdoin College shall have, hold, and enjoy their powers and privileges in all respects, subject, however, to be altered, limited, restrained, or extended by the legislature, &c., as shall, &c., be judged necessary to promote the best interests of said institution." In the first place, it is clear, that this language can by no reasonable, indeed, I may say, by no possible interpretation be construed to include an authority to annul the charter, or the corporation created by it, or the institution itself. The word "annul" is not in it, as it was in the sixteenth section of the original charter of 1794; but the other words of that section are retained, except that the word "extend" is substituted for the word "grant." This alone would furnish an almost irresistible argument, that the authority to annul was intended to be withheld from the legislature. But the words of the section in their actual connexion exclude any authority to annul the charter. It would be utterly repugnant to all common sense to say, that an annihilation of the college would be an act to promote its "best interests." The authority is also limited in other respects. It is not an authority to alter, limit, restrain, or extend the charter generally; but only to alter, limit, restrain, or extend the powers and privileges conferred by the charter on the president, trustees, and overseers, as may be judged necessary to promote the best interests of the institution. The act, then, does not authorize the creation of new boards, in whom the corporate powers and privileges may be vested; nor any transfer whatsoever to other persons of the powers and privileges of the old boards. The powers and privileges of the existing boards may be extended or restrained, limited or altered; but they cannot be transferred over to other persons; for that would be an act of a very different character. Whatever powers and privileges are allowed by the legislature to be exercised for the promotion of the best interests of the institution, are to be exercised by the charter boards. No authority is conferred upon the legislature to add new members to the boards by its own nomination or by that of the governor and counsel of the state. That would be an extension not of the power and privileges of the boards, but of the legislative action over them. If the legislature could add one new member of its own choice or appointment, and not of the choice or appointment of the charter boards, it could add any number whatsoever, five, or fifty, or five hundred. It could annihilate the powers and privileges of the charter boards, under the pretence of alteration or extension. It will hardly be contended, that the legislature possesses a right to substitute itself in the management of the college and its interests, for the charter boards; and if not, how can it confer such an authority upon other persons? The president, trustees, and overseers are to "hold and enjoy their powers and privileges in all respects, subject," &c. &c. But how can they hold

or enjoy any such powers or ·· privileges, if these are liable to be transferred to any other persons, and taken from themselves? If such had been the intent of the parties, other language would have been used; the charter, the college, and the boards would have been made subject to the pleasure of the legislature. The power to annul and transfer the powers and privileges would have found its way into the act in a clear and determinate manner. I agree, that the legislature might authorize an enlargement of the boards, by the appointment of new members to be nominated by the boards; for it would be but an enlargement of the powers and privileges of the existing boards. But it is morally impossible, as I think, to ingraft upon the terms of the act an authority in the legislature to make, of itself, new boards, or to change the whole organization of the old boards, by the addition· of members not chosen by those boards. I am, not prepared, therefore, to admit, that the act of the 19th of March, 1821, enlarging the boards, or the act of the 27th of February, 1826, making the governor, ex officio, a member of the board of trustees, can be maintained as constitutional· exercises of authority. I do not say, that the proceedings of the boards, as actually constituted since the passage of those acts, are void. That is a very different question, turning upon very different considerations. There is a marked distinction in the law, which allows the acts of many officers de facto to be good, although they may not be officers de jure, or regularly elected. The present case is quite · enough loaded with difficulties for the court not to desire to plunge into that point, although, from the strong desire expressed, and the discussions pressed at the bar for an opinion upon this point, it has not been very easy wholly to avoid it.

Let us see, then, how far the act of the 31st of March, 1831, is affected by any of these considerations. It is in its terms an act of positive and direct legislation. It legislates the existing presidents of Bowdoin and Waterville Colleges (the only colleges in the state) out of office from and after the next annual commencement of the colleges. It is a direct exercise of the power of amotion from office by the legislature itself. That very power was expressly and exclusively conferred upon the college boards by the original charter. Massachusetts has never consented, that it should be taken away from those boards, and be exercised by the legislature of Maine; for it is an alteration or modification "affecting the rights and interests of that commonwealth," in regard to those very boards. The act of Maine of June, 1820, has not conferred this power on the legislature; for that act authorizes no transfer of any of the powers of the boards to the legislature, or to any other persons. It would have been quite a different question, ·

if the legislature had undertaken merely to·, alter the term of office of the future presi-·· dents chosen by the boards, with a grant of power to remove such future presidents at the pleasure of the boards. The wisdom of such a provision might be more than doubtful. The authority to make it, might perhaps be more clear. But it is said, that the boards have assented to the act, and have adopted it; and it has, therefore, become binding upon the college. I think, that the argument is not correct. The boards have not adopted it; they have merely "acquiesced" in it, a phrase evidently chosen, ex industria, by the boards, as expressive of mere submission to the legislative will, and not of approbation; a course, which might naturally be adopted to avoid a direct collision with the legislature, and as a respectful appeal for a future revision of the act by the legislature itself. But if the acquiescence of the boards could be construed into an approval of the act, (as, I think, it ought not to be,) still, that approval cannot give effect to an unconstitutional act. The legislature and the boards are not the only parties in interest upon such constitutional questions. The people have a deep and vested interest in maintaining all the constitutional limitations upon the exercise of legislative powers; and no private arrangements be-·· tween such parties can supersede them. In-·· dependent, however, of this general ground,. there is another of great weight and importance; and that is, that President Allen was in office under a lawful contract made with the boards, by which contract he was to· hold that office during good behavior, with a fixed salary and certain fees annexed thereto. This was a contract for a valuable consideration, the obligation of which could not,. consistently with the constitution of the United States, be impaired by the state legislature. The act of 1831 directly impairs the obligations of that contract. It, ipso facto, takes away from President Allen the tenure by which he held his office; and removes him from it. Now, it was as little competent for the legislature to exercise this authority, as it was for the boards of the college. The president, holding his office during good behavior, could not be removed from office, except for gross misbehavior; and then only by the boards, in the manner pointed out in the original charter. It is no answer to say, that the president personally assented to the proposition to clothe the legislature with an authority of this sort, in futuro. However indefensible any act might be on his part, by which he should surrender for all his successors the tenure of office during good behaviour, which he should yet retain for himself, (a design which I am very far from imputing to him;) still the act of June, 1820, could in no legal sense be construed to apply to past contracts. It could operate only in relation to powers to be exercised by the boards, in futuro. And,. at

all events, he has not assented to the act of 1831; and has resisted it, as in his opinion oppressive, vindictive, and unconstitutional.

In every view, therefore, in which I have been able to contemplate this subject, it seems to me, that the act of 1831 is unconstitutional and void, so far as it seeks to remove President Allen from office. The legislature could not constitutionally deprive him of his office, or of his right to the salary and perquisites annexed thereto.

The other question in the case is of minor importance to the parties; but still in a legal point of view it is entitled to grave consideration. From what has been already stated, President Allen is de jure in office; and as there is no pretence to say, that he has not always been ready to perform the duties of his office, he is entitled to recover against the corporation the entire emoluments, annexed by his contract to the office at the time, when he accepted it, or which have since been annexed to it. But the present suit is not brought against the corporation. It is against the treasurer of the corporation personally, as having received money for the use of the plaintiff. To justify a recovery, then, it must be clearly made out, that there is in his hands money, which has been specifically appropriated to, and belongs to the plaintiff, as president of the college. As to this part of the case, there may arise a distinction between the salary, and the fees of office. Since the college commencement in 1831, no money has come into the hands of the treasurer, which by any order of the board has been specifically directed to be paid to the president of the college, eo nomine, or to the plaintiff. Before that period the salary was payable quarterly, and was accordingly paid by the treasurer, under the general vote of the board already stated. It was a duty incumbent upon him so to do, in order to carry that vote into effect; and if funds existed in his hands sufficient for the purpose, there was an implied appropriation of those funds for that purpose. But the acquiescence of the boards at that period in the act of the legislature of 1831, and their information to the plaintiff of that acquiescence, and their proceeding to elect a new president, (though ineffectual,) amounts, as I think, to an implied revocation of the authority to pay over any future salary to the plaintiff, as president. They treated him, as no longer in office, and had a right to take from their treasurer (who is but their agent) the authority to pay to the plaintiff any farther salary, and to assume upon themselves all the consequences of a breach of their contract. But as to the fees for academical and medical degrees, the posture of the case is somewhat different. It is true, that the act of 1831, in the second section, declares, that the fees paid for degrees shall thereafter be paid into the treasury for the use of the college. But, so far as regarded the plaintiff, who, by his contract and the by-laws, was entitled to those fees, the act was inoperative. Besides, the boards have never acquiesced de facto in this part of the act. On the contrary, in September, 1832, there was an express refusal to change the former by-laws, by which "candidates for either degree shall pay five dollars each to the treasurer for the use of the president;" so that those by-laws, at least so far as the plaintiff is concerned, remain unrepealed; and the fees received by the treasurer for such degrees, have been expressly received by him for the use of the president. They are strictly money had and received for his use; and as the plaintiff still continues de jure president, he is entitled to them, unless there is some stubborn rule of law, which stands in his way.

It is a very clearly established principle of law, that if one man receive money, which ought to be paid to another, or belongs to him, this action for money had and received will lie in favor of the party, to whom of right the money belongs. So it is laid down by Lord Chief Justice Willes, in Scott v. Surman, Willes, 400;[4] and the doctrine has ever since been adhered to. Nor is there any difficulty in maintaining such a suit, simply because it involves a trial of the title to office, if the party has once been in possession. Upon this point nothing more is necessary than to refer to Arris v. Stukely, 2 Mod. 260, and Boyter v. Dodsworth, 6 Term R. 681.[5] It seems to me, therefore, that, as to the fees actually received for degrees by the treasurer for the president, the suit is maintainable, and, as to the salary, not.

I have now finished all that is necessary to be said for the decision of this cause. But I cannot dismiss it without expressing my regret, that it has ever come before the court, and that I have been deprived of the assistance of my learned brother, the district judge, in deciding it. If this court were permitted to have any choice, as to the causes, which should come before it, this is one of the last, which it would desire to entertain. But no choice is left. This court is bound to a single duty, and that is, to decide the causes brought before it according to law, leaving the consequences to fall as they may. It is impossible, in any aspect of the case, not to feel that the decision is full of embarrassment. On the one hand, the importance of the vested rights and franchises of this literary institution has not been ex-

[4] See, also, Woodward v. Aston. Freem. 429; Mayor of London v. Gorey, Id. 433; Howard v. Wood, Id. 474, and note of Mr. Smirke.

[5] Green v. Hewett, Peake, N. P. 182; Rains v. Commissary of Canterbury, 7 Mod. 147; Bowell v. Milbank, 1 Term R. 399, note; Sadler v. Evans, 4 Burrows, 1984; Drew v. Fletcher, 1 Barn. & C. 283; Lightly v. Clouston, 1 Taunt. 115, per Heath J.; Hall v. Marston, 17 Mass. 575; Hearsey v. Pruyn, 7 Johns. 179, 182.

aggerated; and on the other hand, the extreme difficulty of successfully conducting any literary institution without the patronage and cordial support of the government, and under a head, who may (however undeservedly) not enjoy its highest confidence, is not less obvious. But these are considerations proper to be weighed by others, who possess a discretion and voice in a fit adjustment of controversies of this sort. To the court is left the humbler, but unenviable task of pronouncing a judgment, such as a just reverence for the law, and a conscientious discharge of its duty, impose upon it.

The verdict taken for the defendant must, pursuant to the agreement of the parties, be set aside, and a verdict entered for the plaintiff, for such a sum, as shall be ascertained by an auditor to be appointed by the court, as due to him for the fees for degrees, received by the defendant for the use of the president.