## The People ex rel. the Regents of the University v. The Auditor General.

*Mandamus: Regents of the University: Professorship of homœopathy.* The legislature having provided for the payment, to the Regents of the University, of a tax of one-twentieth of a mill on the dollar, upon all the taxable property in the state, "*Provided*, That the Regents of the University shall carry into effect the law which provides that there shall always be at least one professor of Homœopathy in the Department of Medicine, and appoint said professor at the same salary as the other professors in this department." And the regents having adopted certain resolutions "that there be organized in the Department of Medicine a school to be called the Michigan School of Homœopathy, to be located at such place (suitable in the opinion of the Board of Regents) other than Ann Arbor, in the State of Michigan, as shall pledge to the Board of Regents by June 20th next, the greatest amount for buildings and endowment of said school," and appropriating $3,000, besides the salaries of Professors, out of said tax, to be expended in establishing said School of Homœopathy, and appointing, for the present, one Professor in said school at the same salary as the other Professors, the Auditor General refused to issue his warrant on the State Treasurer for the payment of any of the money raised by said tax, on the ground that the resolution of the Regents did not constitute performance of the condition, upon which the aid was granted to the University; and insisting that the condition required the appointment of such Professor in the existing Medical Department of the University at Ann Arbor, and not elsewhere.  On motion for a *mandamus* to compel him to issue his warrant, the writ was not granted, a majority of the court not assenting to the issuing of the writ.

*Heard June 2d.  Decided July 13th.*

*Mandamus.*

This was an application, by the Board of Regents of the Michigan University, to compel the Auditor General to pay the sum of $3,000, which they had appropriated by resolution to establish a school of Homœopathy.

The petition set forth that, by the act of the legislature — *Sess. L. 1855, p. 232* — it was provided that there shall be "at least one professor of Homœopathy in the department of medicine" in the University.  That, by the act of 1867, it was further provided that the Board of Regents of said University should appoint said professor in the department of medicine at the same salary as the other professors in said department.  That subsequently the said regents passed the resolutions stated in the opinion of CHRISTIANCY J.

The respondent declined to pay the said money, for the reason that the Regents proposed to establish said school at a place other than Ann Arbor, the present seat of the University, and that their action did not constitute performance of the condition of the grants.

*Walker & Kent,* for the relators.

There is but one question here. Is there a professor of Homœopathy in the department of medicine in the University of Michigan?

The regents claim that they have fully and fairly complied with the law, and made the appointment contemplated.

The Auditor General takes the ground that the location of the school at some other place than at Ann Arbor is illegal. It must be conceded that the regents have entered upon the purpose of establishing the school of homœopathy in good faith. As to the question of policy we have nothing to do; we have merely to consider the right construction of the law.

It is a question of power. Have the regents the power to so locate the school? There is nothing in the law itself which indicates that the departments must all be confined to one place.

(Mr. Kent here referred to several statutes providing for branches of the University in different congressional and judicial districts of the state. One of these provided that such branches shall not have the right of conferring degrees.)

It was not at all necessary that the University, in all its parts, be located at Ann Arbor. The word University properly applies to a union in one whole, of many parts; as universe, comprehending parts in one; a collection or union of a number of colleges in one corporate body: as the University of London, a corporation of London, but including associate colleges in Canada and other British possesions.

The University of Cambridge is located at Cambridge, but its medical school is at Boston.    At Paris the University of France is a corporate body, having branches everywhere through France.

As a matter of convenience, the location should be left to the discretion of the Board of Regents.    Departments should be located where the best practical advantages can be had.    There might be good reason for the location of a department of mining in a mining district, and equally good reasons why medical departments should be located where there is a large population.

There is nothing in the law limiting the Board of Regents from establishing different departments in different places.    Can the court decide that the regents have exceeded their powers?

*Wm. L. Stoughton*, Attorney General, and *Wm. Jennison*, for respondent.

The law of 1851 — *Comp. L. p. 711* — declares that the University shall consist of at least three departments: *first*, a department of literature, science and arts; *second*, a department of law; *third*, a department of medicine; *fourth*, such other departments as the regents shall deem necessary.

The law of 1855 provides that there shall be at least "one professor of homœopathy in the department of medicine."    By the law of 1867 it is provided that the regents shall "appoint said professor in the department of medicine, at the same salary as the other professors in this department."    The *Constitution, Art. 12*, § *8*, provides that the Board of Regents shall have the general supervision of the University, and the direction and control of all expenditures from the University interest fund.

1.    The regents have no such controlling power outside of the act of the legislature as justifies them in establishing a school of homœopathy in a place separate and apart from

the place where the "department of medicine" in the University is established — to wit, at Ann Arbor.

The entire legislation concerning the University shows that the legislature gives to the Board of Regents but limited control. The corporation is a public one, created for a public purpose, and supported by the public fund. The corporators have no private interest whatever.

The Legislature is the guardian. The Regents are instruments. — *Laws 1817; Id. 1821, p. 448; Id. 1827; Id. 1837, p. 234; Id. 1867, p. 85; 4 Mich. 222; 12 Id. 166.*

2. They are therefore governed by the limitations of the act. That act provides that there shall be three departments, one of which shall be the "department of medicine," consisting of its various professorships, but an entirety in itself. A division or separation of the parts of the department is inconsistent with the language of the act, and the object of its establishment. A medical education can only be obtained through the means of the facilities offered by the department. Section 11 of the act provides that the government of the several departments be entrusted to the president and faculties of the University; clearly showing that it was never intended that the said "departments" should be separated from the seat of the University, the residence of the president and faculties. The law of 1867, under which the regents seek to obtain this money, provides that a professor of homœopathy shall be appointed in the "department of medicine, at the same salary as the other professors in this department."

This language surely can only mean that a new professor is to be added to the professorships already existing in the "department of medicine" in the University at Ann Arbor. As it is admitted that the professorship is to be established at a place other than where the department of medicine already is, the Auditor General has no authority to pay out money for such a purpose.

It can not be claimed that the "school" is established as a branch of the University.

*a.* It does not appear that the income of the University will admit of establishing branches.— *Comp. L.* § *2200.*

*b.* The fact that branches of the University can not confer degrees, would defeat the very object the legislature had in view—the placing both systems of medicine on an equality so far as public instruction is concerned.

*c.* The fact that the resolutions appropriate over $1,500 per year shows conclusively that it is not a branch,— *2 Comp. L.* § *2200, subd. 18.*

*d.* The regents have neither selected a trustee or a chartered institution of the state.— *Id.* § *2201.*

The defendant has no desire to keep the money in question from the University. But it is his duty to see that money is not paid out of the treasury in violation, or without authority, of law.

CHRISTIANCY J.

The controversy in this case grows out of the conflict between two hostile schools or theories of medicine, both claiming the public patronage and the aid of the public funds for their promulgation in the medical department of the University. The adherents of the allopathic theory, which is the oldest and most generally recognized, having obtained a legal recognition from the regents in the establishment of the medical department, have continued to keep the exclusive control of it to the present time. While the adherents of the opposite, or homœopathic school, claiming equal rights in an institution supported alike by the common funds of the whole people, have been unable to obtain any recognition from the board of regents, or, up to this time, any aid from the public funds for teaching their theory of medicine in this public institution. Fortunately, the present case does not call upon us to determine the

merits of the respective theories or systems about which the "doctors disagree."

But the question whether the homœopathic theory should be recognized and taught in the medical department of the University as well as the allopathic, and both thereby be placed upon substantially the same fair grounds of competition, and allowed to test by results their respective claims to popular patronage, has twice been presented to the legislature and deliberately considered and decided by them, so far as they have any power over the question, in a manner which can leave no reasonable doubt of their intention.

First, in 1855, when the act of 1851, for the government of the University, was amended by adding at the end of the fifth section the following words: "Provided that there shall always be at least one professor of homœopathy in the department of medicine"; so that the section, when amended, should read as follows: "The regents shall have power to enact ordinances, by-laws and regulations for the government of the University, to elect a president, to fix, increase and reduce the regular number of professors and tutors, and to appoint the same, and to determine the amount of their salaries: *Provided*, That there shall always be at least *one professor of Homœopathy in the department of medicine.*"— *Laws 1855, p. 232.* This act was approved February 12, 1855.

At the January term of the late Supreme Court for 1856, the regents not having complied with the injunction of this act, to appoint a "professor of homœopathy in the department of medicine," one Drake, a private citizen, moved the court for a mandamus to compel the regents to perform this duty. To this the Regents, after some preliminary objections, answered in substance that, owing to the antagonism between the two systems of medicine, they could not act wisely upon the subject without full deliberation; that they had, in the previous March, appointed a committee to take the subject into consideration, and correspond

with the various institutions in Europe and America to ascertain the feasibility of uniting such a professorship with. the existing college, and how, if possible, it could best be done, and where the best man could be found, and that this committee had not concluded its labors.

To this the relator demurred. The majority of the court, after deciding that the proceedings for a mandamus could not be maintained at the instance of Drake, the relator (who showed no particular interest affected), without the action of the Attorney General or the Prosecuting Attorney — a decision which disposed of the case and left nothing for adjudication — nevertheless proceeded to give their opinion upon the question raised by the demurrer: and after intimating that they could not "discover in the answer of the Regents, or in the visible result of their labors any clear evidence of activity or zeal in the prosecution of this duty," they declare that they can not, on the other hand, clearly perceive, under all the circumstances of the case, that there had been any unnecessary delay or lack of good faith in their proceedings. They further remark that the regents "aver that they have acted in good faith, but, at the same time, under the influence of much uncertainty as to the constitutionality of the law," "and we are compelled (say the majority of the court) to recognize in this question what might well suggest doubts of the binding force of the law, and occasion some hesitation in their action."

This remark seems to have been understood, and was probably intended as the intimation of a doubt of the constitutional power of the legislature to control the action of the regents in the manner attempted in the act. Owing to the expression of this doubt, or to some other cause, we hear nothing more of any attempt on the part of the regents for more than eleven years to carry the act into effect. Whether their committee ever made a report we are not informed. But probably the regents would not claim to have been endeavoring in good faith to carry into

effect this statute for the whole or any part of the eleven years succeeding: believing their duty to the University required them to disregard the act. After that decision the probability is that no further effort was made to give it effect. And, owing probably to the same intimation of the court, no further attempt seems to have been made to compel their obedience by mandamus.

But during the session of 1867 an application was made to the legislature for a grant of further pecuniary aid to the University beyond the income of the University fund. This legislature, like that of 1855, still determined that students in the medical department should have the opportunity and the option of studying medicine, as well upon the homœopathic as the allopathic system, were not willing to grant the pecuniary aid asked, unless they could at the same time secure this object. And seeing that the regents had disregarded their wishes as expressed in the act of 1855, and perhaps doubting their power to control the action of the regents in this matter by direct legislative injunction, they determined to grant them further pecuniary aid upon the condition precedent, that the regents should first carry into effect the act of 1855, before any of the money to be raised for this purpose should be paid to them; thus avoiding all question of constitutional power. To accomplish this purpose, the act of March, 1867, imposing a tax of one-twentieth of a mill upon the dollar of all taxable property in the state, was made subject to the express proviso, "That the Regents of the University shall carry into effect the law which provides that there shall always be at least one professor of homœopathy in the department of medicine; and appoint said professor at the same salary as the other professors in this department; and the state treasurer shall not pay to the treasurer of the Board of Regents any part or all of the above tax, until the regents shall have carried into effect this proviso."

THE PEOPLE *v.* THE AUDITOR GENERAL.

Under this act of 1867, (even admitting the act of 1855 not to have been obligatory upon the Regents,) it was for the Regents to elect whether they would comply in good faith with the act of 1855, and this proviso in the act of 1867, according to the true intent and understanding of the Legislature, or forego all advantages of this appropriation, which was only made them on this express condition.

The Regents claim thus to have complied with this condition by the adoption on the 25th of March last of the following resolutions:

"*Resolved*, That the Board of Regents accepts the aid proffered by the Legislature of Michigan, by the act approved March 15, 1867, with the terms and conditions thereof.

*Resolved*, That in order to comply with the conditions imposed by said act, there be organized in the department of medicine a school, to be called the "Michigan School of Homœopathy," to be located at such place (suitable in the opinion of the Board of Regents) other than Ann Arbor, in the State of Michigan, as shall pledge to the Board of Regents, by June 20 next, the greatest amount for the buildings and said endowment of school.

*Resolved*, That two professors be appointed for said school, one at this time, and another prior to the opening of said school, and others as may be necessary.

*Resolved*, That the sum of $3,000 be appropriated, besides the salaries of the professors, out of the state tax, so donated to the University, to be expended in establishing said School of Homœopathy.

*Resolved*, That Dr. Chas. J. Hempel, be apppointed Professor of the Theory and Practice of Homœcpathic Medicine in the Michigan School of Homœopathy, at the salary of $1,000 per annum, from this date, to be paid out of said fund so donated."

Claiming that these resolutions constitute a full performance of the condition of the appropriation, the Regents, by their treasurer, have applied to the Auditor General for his warrant upon the state treasurer for the money, or a part of it, raised by the act of 1867. The Auditor General, not satisfied that this action constitutes a performance of the condition, has refused his warrant; and the Regents now move for a mandamus to compel him to issue it.

17 MICH. — M.

Whether this action of the Regents constitutes a full performance of the condition of the appropriation, is the only question necessary to the decision of this case.

The power of the Regents, independent of these acts of 1855 and 1867, to establish such a professorship in the medical department at Ann Arbor, where that department has from the first been established, and was in successful operation at the time of these acts, is not denied. On the other hand, the regents do not claim the power of establishing this, or any other professorship, as a part of the University, at any other place, from either of these acts. But they claim that, under the general powers of supervision and control of the University, by the Constitution and the act of 1851, they have the right to establish professorships, as a part of any department of the University, as well at any other place as at Ann Arbor; and hence that they are at liberty, under these acts of 1855 and 1867, to establish this particular professorship elsewhere; and that this will constitute performance of the condition upon which this appropriation was granted.

While I do not concur in this view, but hold that the University, having been located at Ann Arbor by the act of 1837, *Sess. L. p. 102*, however desirable it may be to establish a department or professorship elsewhere, a legislative permission to that effect must first be obtained — see *Underwood v. Waldron, 12 Mich. 73; People v. Trustees of Geneva College, 5 Wend. 211; People v. Oakland County Bank, 1 Doug. Mich. 282; Comp. L.* § *2192* — though doubtless the Regents may perform their functions any where in the state, and all the powers of the several faculties are not necessarily confined to that locality—yet I do not, for the purposes of this case, consider it necessary to discuss this question of power in any way: and shall therefore proceed to consider the question now before us, upon the assumed hypothesis that the Regents, independent of these acts, had, prior to and at the time of their passage, an implied power to establish

professorships elsewhere than at Ann Arbor; and I proceed
to inquire whether, upon this admission, these resolutions of
the Regents looking to the establishment of a Michigan
School of Homœopathy at some place *not yet determined
upon*, other than Ann Arbor, constitute a performance of
the condition which the legislature intended to impose by
the adoption of the proviso.

It is essential to the fair understanding of this question
to bear in mind the circumstances under which the acts
containing the condition was passed.

It must be recollected that at the time of the passage
of both these acts of 1855 and 1867, the University, with
all its departments and professorships; its buildings, libra-
ries, cabinets, laboratories, apparatus, and all the other con-
veniences and property of the institution, had been for
years existing, in fact, upon the University grounds at Ann
Arbor; where the medical department and that of literature,
science and the arts, had already, in 1855, been for years in
successful operation, and that these and the law department
were all in still more successful operation at the same place
in 1867; that the University as a whole, had been by law,
located there for thirty years, and that none of the depart-
ments or professorships had, from its first establishment
there, ever been located elsewhere. We must also recollect
that large and commodious buildings had for some years been
erected upon the University grounds, at the same place, for
the special use of, and occupied by the department of medi-
cine; that in these buildings had been provided, at large
public expense, such apparatus, furniture and conveniences
as are essential to their use, in the attainment of an educa-
tion in the medical profession in all its branches. We must
also bear in mind that in the acquisition of the scientific
knowledge necessary alike to the profession under both the-
ories of practice, the same preliminary studies are required,
the same knowledge of all cognate sciences; that in most
branches of the science of medicine itself—such as anatomy,

physiology, surgery, obstetrics, and even for the most part pathology—the course of instruction is the same, and the books and authorities the same: the two systems differing mainly in their theories of the principles upon which medicines are supposed to operate in the cure of diseases; that in fact four-fifths of the entire course of professional instruction are the same under both systems; and all the same apparatus, the anatomical demonstrations, and surgical operations, the same material, collections of specimens and other conveniences for instruction, and therefore most of the same professorships and lectures are required alike by the students of each system.

Giving due weight to these considerations, which we must naturally suppose would operate upon the minds of legislators endowed with plain common sense; bearing in mind the history of the conflict between the two systems in the legislature and in court; the persistence with which the legislature adhered to their determination to secure instruction in homœopathy in the department of medicine; is it not most natural to infer that the legislature when they spoke of a "professor of homœopathy in the medical department," used the language in the ordinary popular sense, as intended to designate the medical department as it was already established and in operation at Ann Arbor; and that they intended such professorship to have a *real* and *actual* rather than 'a *merely metaphysical* and *purely nominal* connection with the department of medicine? Is it not reasonable to infer that they intended to give to the professorship of homœopathy the same essential advantages growing out of an immediate and real connection with the department of medicine, as already established, that were enjoyed by the other professorships in that department? that they intended to give to the students in that department, if they should so elect, an equal opportunity of studying the profession upon the homœopathic system, with the like substantial advantages to be derived from the other professorships in

the department, and the other advantages incident to a direct and intimate connection with the department and with the University?

Would it not, in fact, border upon absurdity, to undertake to account for the solicitude and persistency of the legislature in this matter, if, after all, they only intended to secure the establishment of a single professorship (for this is all that is required), at some place other than Ann Arbor, having no real connection with the University or the department of medicine, and none of the advantages to be derived from such a connection — no aid from the other professors — when more than four-fifths of the studies essential even to the homœopathic physician, could not be pursued with any advantage in such a separate school of homœopathy alone?

If this had been their purpose, why call upon the Regents of the University to help them accomplish it? For, upon this idea, the Regents might almost as well be called upon to mingle in the affairs of a railroad corporation, or any other institution having no real or natural connection with the University.

The homœpathic theory constitutes but a small part of the study essential to the homœopathic physician. Did the legislature seek to confine all the students to the study of that theory *alone,* who should choose to study it at all? Was the purpose of this apparently careful and persistent course of legislation intended only as a solemn mockery—as a dismal practical joke?

It seems to me very evident that the legislature could not have contemplated a separate school of homœopathy alone; and yet it is equally clear that if, as the Regents seem to suppose, they contemplated a separate school at all, they must have contemplated a school for the study of homœopathy alone; for they have made no provision for giving instruction to such students in any other branch of

medical science, if the school is to be elsewhere than in the medical department at Ann Arbor.

It will be conceded that the legislature contemplated a professorship in which students might actually receive instruction; they must therefore have contemplated a professorship which should have a potential existence *somewhere;* so established, at some place, as to be able to enter upon the practical business of giving instruction to students. But these resolutions establish no such professorship anywhere. At most they look only to the future and contingent establishment of a "Michigan School of Homœopathy," at such place other than Ann Arbor, as, in the opinion of the regents shall be suitable, and "as shall by the twentieth day of June (then) next, pledge to the Board of Regents the greatest amount for buildings and endowments for said school." Now it does not appear that any place has yet pledged any sum for those purposes; and certainly it can not be conclusively presumed that any place will do so. Until this is done, it is not to be established at any place, or rather, in plain English, it is not till then to be established at all, even in these paper resolutions. I am therefore inclined to think the regents are at least premature in this application; and that, under any view that can be taken, they ought to have waited until this professorship should be established as a practical entity, capable of vital action.

Suppose a student wishes to resort to this "Michigan School of Homœopathy" for instruction. Where will he find it? It is yet to be found only in the state at large, as much in one place as another; omnipresent except at Ann Arbor, but no where visible or palpable to the senses. Will he find it any the more readily by being told, in the language of this resolution, that it is "organized in the Department of Medicine," not where the department is, but at some place not yet determined, outside of. Ann Arbor? Can it be for a moment seriously contended that this was all that was contemplated by the Legislature?

Have the legislature at two separate sessions been making all this ado about a professorship of homœopathy, for no other purpose than to enable such professor to draw a salary, without the performance of any duty?

These considerations, with many others which might be urged, produce upon my mind a very strong conviction that the legislature intended to require, by this condition, that the professorship of homœopathy should be established *practically,* and in fact *in* the medical department, where that department is already established and in operation, at Ann Arbor.

Upon the policy or impolicy of attempting to establish it there, I express no opinion. It is not a question for this court. Of the good faith of the Regents, however, and their desire to act as may be best for the interest of the University, there can be no reason to doubt. But I think they have mistaken the true intent of the condition upon which this appropriation was made, and that they have mistaken in some measure their constitutional powers. The mere power of "supervision" given by the constitution, whether subject to, or independent of, legislative control, should not, I think, be confounded with the power to create or establish a University, or to change its location, in whole or in part, as previously fixed by the legislature and recognized by the constitution.

GRAVES J.

The act of 1851, for the government of the University, provided that there should be three departments, one of which should be a department of medicine, and that such other departments should be added as the Regents should deem necessary, and the state of the University fund should allow. As originally adopted, the fifth section of the act was as follows: "Section 5. The Regents shall have power to enact ordinances, by-laws and regulations for the government of the University; to elect a President; to fix,

increase and reduce the regular number of professors and tutors, and to appoint the same, and to determine the amount of their salaries."

In 1852, the Board of Regents made their fourteenth annual report, and therein made the following representations:

"In the University it is designed to organize all the Faculties, with the exception of the theological, which will be left to the different denominations. It is to be hoped, however, that schools of theology will be established at Ann Arbor. In some departments of theological science, it may be possible for the different denominations to unite in establishing common professorships. In others they will naturally choose to have separate professorships. But every one will perceive, at once, the advantages to be derived from collecting all the learned Faculties in one place, where the students can enjoy the common benefit of the University library, and attend, at their pleasure, while engaged in particular professional studies, lectures on other branches of literature and science. Thus, too, a more general spirit of scholarship will be awakened, and a generous competition kept alive. There are already organized two Faculties: that of science, literature and the arts, and that of medicine. The medical department already established belongs to the University proper. Here instruction is carried on by lectures, the design of which is to present to students a complete outline of medical science, and to direct them in their studies. By the study of learned works, and by availing themselves of all the preparations made for the thorough study of their profession, they shall be enabled to compose the thesis, and pass the examinations which are to test their scholarship and prove them worthy of being admitted as Doctors of Medicine."

This report having been made in December, 1852, the legislature, in the winter of 1855, amended Section 5 above quoted by adding thereto the following proviso: "Provided

that there shall always be at least one professor of homœopathy in the department of medicine." The Regents omitting to make any appointment under this proviso, an application was made to this court, at the January term, in 1856, on the relation of a private citizen for a mandamus to compel such appointment.

The application was resisted upon several grounds; but among the most prominent were the following: *First,* That the Regents had a discretion, under the constitution, in the administration of the University, and in the application of its funds, with which the legislature could not interfere in the manner attempted; and, *second,* That a committee appointed for the purpose by the Regents were then conducting an inquiry as to the feasibility of uniting such a professorship as that proposed with the existing college, and, if found practicable, then in what way the project could be most advantageously carried out, and where the most suitable person for the position could be found; and that the committee had not had sufficient time to complete its labors.

Although the court refused the application without finding it necessary to pass distinctly upon the constitutional question, it seems proper to quote a considerable portion of the opinion delivered on that occasion, in order to understand the real significance of subsequent events.

The observations to which allusion is here made were as follows:

"The views we have expressed would seem to make it unnecessary to decide the other questions presented, particularly the constitutional question, but we have thought it would be proper to pass upon the questions presented by the answer and demurrer. We will, therefore, proceed to an examination of the answer. The facts being admitted, their sufficiency in law to defeat this proceeding is alone to be considered. The respondents state their belief, that the law requiring them to appoint a Homœopathic Professor in

the Medical Department of the University, is unconstitutional. Yet, being desirous of treating with proper respect the expression of the legislative will in the section quoted, they did, on the 30th of March last, appoint a committee to enter into correspondence with other universities in Europe, and in this country, to determine the feasibility of establishing such a professorship, and the most eligible person to fill such a chair, when established, and, that the committee has been actually engaged ever since in conducting such correspondence, and in gathering information from all sources, and are still engaged diligently in the same work.

The respondents are constitutional officers, to whom are confided by the Constitution, *Art. 13, Sec. 8,* "the general supervision of the University, and the direction and control of all expenditures from the University Interest Fund." They are elected by the people. They come, at short intervals, fresh from the body of the people, and can not be supposed to be influenced by sentiments not common to those they represent. To their judgment and discretion, as a body, is committed the supervision of the financial and all other interests of an institution in which all the people of this state have a very great interest. In the words of the law in question, they are required to enact ordinances, by-laws, and regulations for the government of the University; to reduce and increase the regular number of professors, and to appoint the same, and to determine the amount of their salaries. To this body of men, possessing such powers, and upon whom such duties are incumbent, this proviso is directed. They had already provided professors for the medical department, under a system which had been in successful operation many years, and they were required to introduce a new, and as they say, an antagonistic element into that department, which in their judgment was likely to clash with the system already established, and produce embarrassment to the Board, and the institution under their control, not

easily to be surmounted, and which it required time and investigation to harmonize and adjust. They, nevertheless, entered upon the proper investigations, with a view to accomplish the duty devolved upon them by the law. They aver, that in the month of March, of last year, and before the law took effect, they entered upon the active discharge of duties, which must precede the actual appointment of the new professors; and, though we have not been able to discover in their answer, or in any visible result of their labors, any clear evidence of their activity and zeal, in the prosecution of their duty, neither are we able clearly to perceive, under all the circumstances of the case, that there has been any unnecessary delay, or lack of good faith in their proceedings. They aver that they have acted in good faith, but, at the same time, under the influence of much uncertainty, as to the constitutionality of the law, and we are compelled to recognize, in this question, what might well suggest doubts of the binding force of the law, and occasion some hesitation in their action.

The relator suggests no pressing necessity for the immediate action of the Board, neither does he show that the rights of any individual or class of persons is jeoparded or injuriously affected by the delay that has occurred in their action. All that is averred, or that can be inferred from the affidavit of the relator, is, that the Board of Regents have hitherto, and unnecessarily, neglected to obey the behests of the law, which is claimed to be binding upon them, and which demands a more speedy obedience to its requirements than has been yielded to it by the respondents. The real question is one of time. The respondents have not refused to act, but they have acted tardily, and, as the relator suggests, in bad faith, if at all. We, however, are of the opinion, upon a full view of all the facts presented for our consideration, and which are admitted by the relator, that the case made out is not one which would authorize the further action of this court, at this time. We admit,

that a mandamus, though a prerogative writ, is demandable of right in a proper case, yet it is only to be granted by this court in the exercise of a sound legal discretion; and, hence, ought only to be invoked in cases of the last necessity. This necessity we have been unable clearly to discover in this case. The Board of Regents have a sound discretion to exercise, and until it is made apparent that they seek to evade the law, by unnecessary and willful delays, the exercise of our discretionary power can not be called into action."— *The People v. The Regents, 4 Mich. 98.*

The opinion from which this citation is drawn was pronounced more than twelve years ago, and received the unqualified assent of all the members of the court.

No appointment, however, being made in conformity with the requirements of the act of 1855, the legislature, in 1867, passed an act in aid of the University, which provided "that there shall be assessed, upon the taxable property of this state, in the year 1867, and in each year thereafter, for the use, aid and maintenance of the University of Michigan, the sum of one-twentieth of a mill on each dollar of said taxable property, assessed and paid into the treasury of the state, in like manner as other state taxes are by law levied, assessed and paid; which tax, when collected, shall be paid by the state treasurer to the treasurer of the Board of Regents of the University, in like manner as the interest on the University fund is paid to said treasurer of said board: *Provided,* That the Regents of the University shall carry into effect the law which provides that there shall always be at least one Professor of Homœopathy in the Department of Medicine, and appoint said professor at the same salary as the other professors in this department, and the state treasurer shall not pay to the treasurer of the Board of Regents any part or all of the above tax until the Regents shall have carried into effect this proviso."

On the 25th day of March, 1867, the following resolutions were adopted by the Regents:

"*Resolved*, That the Board of Regents accepts the aid proffered by the Legislature of Michigan, by the act approved March 15, 1867, with the terms and conditions thereof.

*Resolved*, That, in order to comply with the conditions imposed by said act, there be organized, in the department of medicine, a school, to be called the "Michigan School of Homœopathy," to be located at such place (suitable in the opinion of the Board of Regents) other than Ann Arbor, in the State of Michigan, as shall pledge to the Board of Regents, by June 20th next, the greatest amount for the buildings and endowment of said school.

*Resolved*, That two professors be appointed for said school, one at this time, and another prior to the opening of said school, and others as may be necessary.

*Resolved*, That the sum of $3,000 be appropriated, besides the salary of the professors, out of the state tax, so donated to the University, to be expended in establishing said school of Homœopathy.

*Resolved*, That Dr. Chas. J. Hempel be appointed Professor of the Theory and Practice of Homœopathic Medicine in the Michigan School of Homœopathy, at the salary of $1,000 per annum, from this date, to be paid out of said fund so donated."

Dr. Hempel, having accepted the appointment, a formal application was made to the Auditor General, for his warrant upon the Treasurer, for the money raised under the act of 1867, which was refused, upon the ground, among others, that the establishment of the professorship, at a place distant from Ann Arbor, was not a compliance with the legislation of 1855 and 1867. It is understood, also, that the State Treasurer, under the advice of the Attorney General, concurred with the Auditor General in this opinion.

Under these circumstances, an application is made to this court, at the instance of the Regents, for a peremptory mandamus, to require the Auditor General to issue the warrant.

The manifest object of this proceeding, is to draw from the State Treasury, by the compulsory power of this court, the money raised under the act of 1867, and as the constitution declares that "no money shall be paid out of the Treasury, except in pursuance of appropriations made by

law," the application ought not to be granted except upon the clearest conviction of its propriety.

But the peculiar nature of the object sought in this instance does not present the only reason for judicial circumspection.

The law applicable to the writ of mandamus, as expressly declared by this court, determines that the writ should only be issued where the legal right is clear. — *The People v. The Judges*, 1 *Doug.* 319. The whole current of authority is to the same effect. "A mandamus will only lie to give effect to a clear legal right." — *The People v. Supervisors of Chenango County*, 1 *Kernan*, 563, 574. "It ought not to be issued in cases of doubtful right." — *Life and Fire Insurance Co. v. Wilson's Heirs*, 8 *Peters*, 291, 302, 303; 2 *Selwyn's N. P. by Wheaton*, 6 *Ed.* 1094. The writ "may be compared to a bill in equity for a specific performance," — 1 *Chitty's Gen. Prac.* 789 — and it "will not be granted unless the act required to be done be clearly within the act or duty to be performed." — *Id.* 796.

Let it be conceded that, by their general authority, the Regents were authorized to establish branches of the University at places remote from Ann Arbor, and possessed the most ample power to apply, in their discretion, all the funds absolutely provided for the administration of the University. The question as to whether their action in the present instance has been such as to warrant them in demanding, and justify the court in granting the particular remedy invoked must still remain. It is by no means determined by such concession.

The statutes relating to the establishment of a Homœopathic professorship, are considered by the Regents as a legislative offer, to be accepted or refused, and not as making an unqualified appropriation for the use of the University. They have distinctly placed themselves upon this ground in their corporate proceedings and in their opposition to the motion for a mandamus in 1856, and in their present

application.   It is quite appropriate to consider their present petition upon that basis.

In order to do this, however, it is expedient to put aside all reasoning founded on an imputed power in the Regents, to use, according to their discretion, all funds unconditionally appropriated, since, from the nature of the case, and the position taken by them, such an inquiry would be quite irrelevant.

In proceeding to consider the action of the legislature, as the Regents have considered it, as embodying a proposal on the part of the legislature to grant the money on the precedent condition that the Regents should establish a Homœopathic professorship in the department of medicine, it must follow that, in order to enforce payment of the money, the Regents would be bound to show that the condition had been accepted and performed in the same sense in which it was "proffered." — *1 Parsons on Contracts, 5 Ed. 475 and notes, and 477 and notes; Fry on Specific Performance, 135 – 145, 2 Am. Ed. and notes; Hartford and New Haven R. R. Co. v. Jackson 24 Conn. 514; Allen v. Mc-Kean 1 Sumn. 276, 304 – 310.*

And, as we have seen, that the remedy sought is only allowable in a clear case, it is evident that, in the absence of any other objection to it, it should not be granted unless it should be clear that the acceptance and performance were answerable to the intent of the legislature.

If upon the whole case it be at all doubtful whether or not the course pursued by the Regents constitutes such acceptance and performance, then by the hypothesis the writ ought not to issue.

It is maintained, on the part of the petitioners, that they have clearly performed the condition, and according to its just intent and meaning.

The contrary view is understood to be entertained by the respondent, the State Treasurer, and the Attorney General.

Pursuing the theory of the petitioners, that the laws of 1855 and 1867 constituted a proposal to the Regents by the legislature, we may apply the rule of law and ethics, that when the terms of a promise admit of more senses than one, it is to be performed in that sense in which the promisor apprehended at the time that the promisee received it. *Potter v. Ontario and Livingston Ins. Co. 5 Hill, 147, 149; Hoffman v. Ælna Ins. Co. 32 N. Y. 405, 413.*

Is it then clear that the legislature apprehended that the Regents understood their offer as one to be satisfied by the establishment of the professorship at some other place than Ann Arbor? This question can not be fairly considered without keeping in view the precedent and co-existing circumstances. Before the act of 1851, the University was established at Ann Arbor, and grounds there provided for the necessary buildings; and in 1852, much had been done in the improvement of the grounds, in the erection of buildings, and in providing apparatus, a library, and other things requisite for such an institution. The college, in all its departments, was there situated, and the Board of Regents reported, for the guidance of the legislature, that the department of medicine belonged to the "University proper," and that the advantages to be derived from collecting all the learned faculties in one place, could be perceived at once. According to universal understanding, the institution was then regarded, and has been since regarded, as having its seat and its only seat at Ann Arbor.

Under these circumstances, the act of 1855 was passed, and it did not in terms or by inference suggest or imply that the professorship mentioned should be distinguished from the other professorships of the institution, or of the department of medicine, as to the place of its establishment. It is, therefore, not unreasonable to suppose that the legislature, in providing for the new professorship, in the department which belonged to the "University proper," had reference to the condition of things actually existing,

including the local position of such department, and not to a condition which, so far as is known, had never been proposed or intimated. — See the opinion of my brother *Campbell* in *Tyler's case, 7 Mich. 212, 216, 217,* and the several opinions in *Twitchell v. Blodgett, 13 Mich. 127;* also *Norris v. Showerman, 2 Doug. 16; Allen v. McKean, 1 Sumn. 276, 304–310.*

When the application was made to this court, in 1856, to coerce compliance with the act of 1855, it was not intimated by, or on behalf of, the Regents, or supposed by the court, in so far as appears in the report, that the last named act could be complied with except by the establishment of the Professorship at Ann Arbor; while, on the contrary, the Regents took the ground, which was expressly noticed in the opinion of the court, that the law required the introduction of a new and antagonistic element into the department of medicine likely to clash with the system already established, and produce embarrassment to the board and the institution not easily to be surmounted, and which it would require time and investigation to harmonize and adjust. Indeed, it is very plain that some of the objections were based on the tacit admission, that the proviso required the Professorship to be at Ann Arbor.

It does not appear to have occurred to the Regents or the Court that the whole difficulty could be surmounted, and the law, at the same time, complied with, by the simple expedient of establishing the new Professorship at a distance from Ann Arbor; and it seems hardly possible to reconcile the views then expressed, with the supposition that those who expressed them did, at that time, imagine that the law could be thus executed. The court then said, "the real question is one of time," and no other place than Ann Arbor appears to have been thought of.

The controversy attracted much attention, and the general public and the Legislature must naturally have inferred, from the ground of opposition on the part of the Regents

17 MICH. — N.

and the opinion of the court, that the law of 1855 was believed and understood to require the establishment of the new Professorship at the place where the institution and all its Professorships were established, where were accumulated all the instruments of education, and where alone were to be found the buildings provided for the use of the college; and that the difficulty in the execution of the statute, in the view of the Regents, consisted in its requiring that there should be brought together, in the same University, and at the same place, professors of opposing schools in the same department.

The facts which have been mentioned, and the opinion of the court, which has been in part quoted, must have been present to the legislature when the act of 1867 was passed. And when we consider the nature of these facts, and the tenor of this opinion, is it not probable that the legislature then supposed the Regents understood the alleged offer as requiring the specified professorship to be at Ann Arbor?

Is it not probable that those who so persistently insisted upon the new professorship meant and apprehended that the Regents understood that the professorships before established, and that sought to be established, should be placed on terms of substantial equality, in respect to all advantages and opportunities depending upon location, and the instrumentalities of education; and that all students should have access, at all times, to all the sources of knowledge which either school should supply? When we consider all the circumstances, including the representation of the Regents in 1852, that all the faculties ought to be collected at Ann Arbor, is it clear that the legislature, in 1855, intended or supposed they were understood as intending that the new professorship should be established at a distance from that place, and apart from the facilities there provided, even though such action should result in giving superior advantages to the new school?

It seems to me that these questions will not admit of an answer favorable to the views of the petitioners. Notwithstanding that it was urged in 1856 that the new professorship, if introduced, would be an antagonistic element in the University, the Legislature, in 1867, insisted upon compliance with the first act, without any qualification. The Regents at the former time seem to have understood, and I think that the legislature was authorized to infer, that they understood that the act of 1855 required the professorship to be at Ann Arbor.

If the thought of another location was not present to the legislative mind, then the legislature could not have intended a location elsewhere, and if none was intended elsewhere, the design must have been that the professorship should be where the University, including the department of medicine, was situated, since a location at some place was inevitably involved in the statutory requirement.

Upon deliberate consideration I can discover nothing in the laws in question to indicate that any separation of professorships, in the department of medicine, was designed or thought of, but, on the contrary, the purpose appears to have been to supply a new element of instruction for the benefit of all who should attend the college as situated and established.

Whether the action of the legislature in this regard was wise or unwise, whether, if consummated it would be likely to result in injury to the institution, is not our province to determine. The case is not one in which that question could be properly debated, if in any case it could be a proper topic for discussion in this court. The laws in question were enacted in due form; at all events that is not disputed, and the present application is based upon an alleged compliance with them, and not upon an excuse for non-compliance. That the eminent men to whom the people have confided the supervision of one of the noblest educational institutions of this or of any age, have faithfully

endeavored to execute their trust, I have no doubt.    But the question for our determination does not depend upon this consideration.    We are asked by the petitioners to decide in substance that it is clear that they have accepted and acted upon the offer contained in the acts referred to in the same sense in which the legislature apprehended that the Regents understood it, and such decision I can not concur in making.

The legislature required the establishment of the new professorship at some place; and it is not only not clear, but quite unlikely that they meant, or that they supposed the Regents understood them as meaning that it should be at a point distant from the seat of the University and all its appointments.

I am, therefore, of opinion, upon the grounds stated, that the writ ought not to issue.

To avoid misapprehension, it is proper to say, that I am not prepared to admit that the Regents have the power to establish a professorship at a place other than Ann Arbor, but as the disposition of the present case does not require us to decide that question, I forbear to discuss it.

CAMPBELL J.

As a majority of the court have not been able to coincide in opinion upon the motion before us, I propose to indicate as briefly as I can the general views on which I think the relators are entitled to relief.

As the money in dispute is a mere offer to the Regents of that which would not otherwise belong to them, of course the donors may affix conditions to it.    And the condition they have affixed to this grant is that "there shall be at least one Professor of Homœopathy in the Department of Medicine."    This is a plain and single provision, and leaves but a single question open to decision, which is whether any portion of the Department of Medicine can be established at a place outside of Ann Arbor.

The People v. The Auditor General.

The University is divided into three departments, and those are extensive enough to include all branches of human inquiry relating to secular pursuits. There are in the collegiate department, and there may be in either of the others, many entirely different courses of study, which no student can pursue at the same time, and which may or may not occupy in part the same ground. In the various courses of instruction which are now, or which may be hereafter, devised for the teaching of specific arts or sciences, there must always be more or less divergence as students fit themselves for the laboratory, the forge, the mine, the farm, or other branches of business or professional pursuits. And it must always be left to the Regents, as the only body which can lawfully carry on the administration of the University, to parcel out the studies as in their good judgment seems best. Any student who enters the University, and selects his course, must confine himself to that course as they have arranged it, and they must decide what pursuits can profitably be allowed to go on together.

If they should see fit to include in the Medical Department instruction in the theories and practice of any number of conflicting schools, or to provide courses for different special branches, as for dentistry, for diseases of the eye and ear, for nervous diseases, or for the treatment of insanity, it must be obvious that whether these should call for discordant teachings, or should merely require students to follow select but harmonious courses, there must still be some rule which would exclude one student from attempting to learn all at once. If he should attend one course, he must absent himself from others, and this must be regulated by the Regents.

Whether students of one system could profitably attend at the same time the teachings of two conflicting schools, or whether the professors could be wisely or harmoniously amalgamated into one body, is not a judicial question, but one of administration, to be settled by the authorities of

the University; and if students of homœopathy were to pursue their studies at Ann Arbor, we have, as a court, no means of knowing whether they could or would profitably avail themselves of the teachings now established there. Upon many branches of medical teaching it is very obvious that a lecturer must of necessity inculcate his views upon treatment and curative systems, on which there would be radical differences. To what extent these differences would separate students under the various professorships, it is not for us to determine. But it is at least quite possible that there should be a general, if not an entire divergence. In other words, it is impossible for a court to assume that the location of a homœopathic professorship at Ann Arbor would be more desirable or profitable than elsewhere, or that the system could be introduced without an entire division of courses of lectures and other instruction. Such seems to be the conclusion of the Regents, who upon this subject have all the responsibility of determination.

It can not be doubted that where courses of study are different, there is no necessity for conducting them in the same place. And unless there is some rule of law which confines the entire operations of the University to a single place, there can be no objection to the course taken by the Regents in this case.

The only reason given anywhere for denying their power is that under the law, the University is located at Ann Arbor, and that any removal of its place, or any transaction of business away from its place, is unauthorized.

It is beyond dispute that where, by its charter, the business of a corporation is localized, it must be done in the place prescribed. Our own decisions are full on this subject. But it is just as well settled that where the business is not localized no such rule exists.

Thus, for example, we have many corporations where nothing is localized but the business offices. We have several mining charters of this kind. Navigation companies

furnish another familiar instance.    Insurance companies, companies for scientific and exploring purposes, and many others might be readily suggested.

I think that the purposes expressed in the various provisions concerning the University, preclude the idea that all of its operations must be local.    In its origin in 1817, it had no locality prescribed, and its functions were expected to be performed in many places.    So when the modifying law of 1821 was passed, it was located in Detroit, but its functions were ubiquitous.    While thus established, and after it had been directly recognized both by Congress and the treaty making power, its perpetuity was required by Congress and stipulated for by the state upon its admission into the Union, and also fixed by the first state constitution.

When a new law was passed in 1837, which provided for its location in Ann Arbor, the language used was no broader than that which had before located it in Detroit. And, while some of its functions were narrowed, it was expressly designed to cover the whole field of science, art and learning.    Many branches of knowledge can be profitably taught only in favorable localities.    It is not supposable that it was designed to prevent such teaching as should be profitable.    Mining, surveying, geology, and engineering require for their mastery some attendance, either temporary or permanent, at places where such work is being carried on. Medical teaching in its completeness avails itself of hospitals, and must in that case be partially given where hospitals are to be found.    And when we consider that the University is expected to furnish complete teachings, we must read all the charter provisions together, and assume that the reference to locality is not designed to localize all its doings.

If the law of 1837 means any such thing, then it differs from the ordinary charters of which we have any account in the law books.    It is the first law that ever fell under my own notice which confined a corporation not to a

municipality, but to a single parcel of land, as it directs the buildings to be placed on a forty acre lot, to be thereafter designated, and contains no other establishment of locality. If this law operates at all to confine the corporation, it can never carry on its operations off of the quadrangle. The Observatory lot, and any other premises. which its growing needs might require, would all be outside of its legally ordained locality.

It seems to me that the laws locating the University upon a specified tract of land, were not designed to localize all of its educational operations, but simply to make that the great center, as state buildings, and county buildings, or corporation offices, are made centers for public or corporate purposes, while many functions may be performed elsewhere. Where the purposes of the University are so extensive as to require wider facilities for their complete fulfillment, I do not think such provisions require a construction which would hamper them. And I think the Regents in this case have not gone beyond the fair intent of the scheme of the University.

I think the writ should issue.

Cooley Ch. J. gave no opinion.